JASON WRIGHT, A MINOR BY HIS MOTHER AND NEXT FRIEND, DEBRA K. WRIGHT, APPELLANTS, *v.* JOHN SCHUM, RESPONDENT.

No. 18282

November 2, 1989                    781 P.2d 1142

*Geoffrey White,* Reno, for Appellants.

*Jon Douglas Benson,* Reno, for Respondent.

# OPINION

By the Court, SPRINGER, J.:

This is a dog bite case. Eleven-year-old Jason Wright was walking home from a day's swimming when an escaped pit bulldog attacked him and injured him severely. Jason obtained a jury verdict in his favor against the owner of the pit bulldog, but the court dismissed his case against respondent Schum, who was the landlord and owner of the premises from which the dog escaped.

Schum claims that as a landlord he cannot be held liable for the negligent conduct of his tenants for injuries caused to third persons not injured on the leased premises. It is quite clear under

Nevada law that Schum is correct in this assertion and that he cannot be held liable *as a landlord.* We recognized, as late as 1985, in Turpel v. Sayles, 101 Nev. 35, 692 P.2d 1290 (1985), the traditional common law rule "that once a lessee [has] taken possession of property, the landlord [is] not subject to liability . . . [to] others coming onto the land, for physical harm caused by a dangerous condition on the premises. . . ." Although Jason invites us to extend the scope of landlord liability to include cases in which injuries are sustained by one who is bitten by a tenant's dog under circumstances in which the landlord has actual knowledge of the presence of a dangerous animal on the premises and in which the landlord has the right to remove the animal by evicting the tenant, we decline to do so. *Contra* Uccello v. Laudenslayer, 118 Cal.Rptr. 741 (Cal.App. 1975). The trial court, in dismissing landlord Schum from the lawsuit, wisely observed that holding landlords liable for the actions of their tenants' vicious dogs by requiring them to evict tenants with dangerous dogs would merely result in the tenants' moving off to another location with their still dangerous animals. The trial judge likened this approach to the case of a "Typhoid Mary," who was outcast from one place only to continue her deadly disease-spreading activity at another place. In Nevada, Schum's failure to evict a tenant known to him to be harboring a dangerous pit bulldog will not alone provide grounds, as it did in the above-cited *Uccello* case, for holding a landlord tortiously liable for attacks by a tenant's dog.

Another reason why the *Uccello* rule of landlord liability cannot be applied to this case is that, unlike *Uccello,* the injuries to Jason did not occur on the rented premises and, except for defective perimeter fencing mentioned below, the injuries were not directly related to a dangerous condition of the premises.

As a consequence of the general rules of law relating to landlord liability, recently confirmed in the *Turpel* case, Schum cannot be held liable by reason of his status as a landlord nor by reason of his failure to evict a tenant with a dog known by him to be dangerous. This does not end the matter, however.

In *Turpel* we observed correctly that merely because a person had the legal status of being an owner or landlord, such person did not enjoy immunity from tort liability.[1] As put in *Turpel,*

---

[1] In *Turpel v. Sayles* negligence was based on Sayles' failure to carry out her duty as an owner to install smoke detectors in a condominium that she owned. Turpel was injured while trying to warn a family living in the condominium of a fire. Turpel's rescue would not have been necessary if the property owner, Sayles, had installed smoke detectors. Obviously the duty to

there is no reason to except "landlords or property owners from the general application of the basic principles of tort law." *Turpel,* 101 Nev. at 39, 692 P.2d at 1293. Schum, obviously, "as other persons must exercise reasonable care not to subject others to an unreasonable risk of harm." *Id.* at 38, 692 P.2d at 1292 (quoting Sargent v. Ross, 308 A.2d 528, 534 (N.H. 1973)).

The question in this case, then, is not whether Schum is liable to Jason *as a landlord,* but rather whether he is liable "as other persons" for the exercise of due care in not subjecting Jason to an unreasonable risk of harm. Put another way: Is there evidence in this record which, if believed by a jury or fact finder, would support a finding that Schum failed to exercise due care in subjecting Jason and others to an unreasonable risk of harm? We come to the conclusion that Schum's conduct with respect to the escaping pit bulldog could be viewed as creating an unreasonable risk of harm to Jason and others who were open to attack by this dog when he escaped from the custody of his owners. Let us now examine the facts that support this conclusion.

The owners of the pit bulldog, the Pitzers, were month-to-month tenants of Schum at the time the dog escaped from the yard and mangled Jason. When the Pitzers moved into the house, they did not tell Schum that they had a pit bulldog. Schum found this out only when a neighbor, Denise Austin, complained to him that the Pitzers had a pit bulldog and that it had escaped from its yard on two occasions and attacked their dogs, seriously injuring one and killing the other. In addition to his attacks on the Austins' dogs, the Austins observed that the Pitzers' pit bulldog, Buddy, would become agitated and very aggressive when he saw the Austins in their own backyard. On such occasions, Buddy would lunge at the Austins, often wedging his head between the boards of the fence, in an apparent attempt to break through to get at the Austins. Denise Austin and her family were so afraid that the pit bulldog would break into their yard again and injure them that they gave up the use of their backyard.

Denise Austin's husband testified that he was very concerned about the dog's aggressiveness. He stated, "On all occasions [I] carried a can of wasp knock-down spray with me in case the dog happened to come through the fence. I had a loaded twenty-two pistol next to my back door."

Schum claims that he did not know that pit bulldogs were dangerous to humans and specifically denies knowing that this pit

---

install smoke detectors is related to Sayles' status as an owner or landlord, and there would be no duty apart from this status; still, *Turpel* is not a case of "landlord liability"; it is, as stated in the *Turpel* opinion, one of general tort liability.

bulldog was dangerous, except perhaps where other dogs were concerned. That Schum was on notice that the dog would be dangerous if he escaped from the yard is supported by his exposure to the "Beware of the Dog" sign on the front door of the house and by Schum's promise to the Austins that he would "take care of the problem." According to Denise Austin, Schum agreed that he would make the Pitzers get rid of the dog or move out. It certainly can be argued that if he did not think the dog was dangerous, he would not have so agreed. Under these circumstances, a jury could have properly concluded that Schum knew that the dog could be dangerous to others if the dog escaped from the yard. This conclusion is further supported by the fact that Schum allowed the Pitzers to stay on only on their promise that they would at all times keep the dog in the house or in the yard on a chain. Had he not some apprehension about the dog's dangerous nature he would not have insisted, at pain of losing a tenant, that the Pitzers secure the dog in some manner. Shortly after Schum gave this ultimatum to the Pitzers, the pit bulldog, unchained, broke through the fence and attacked the dog of another neighbor, the Andersons.

The question comes down to whether under these circumstances Schum can be judged to be free of negligence as a matter of law and thus entitled to dismissal under Rule 41(b).

If Schum is to be held liable under "the basic principles of tort law" (*Turpel,* above), it must be as a person who has negligently undertaken with respect to the pit bulldog to perform the duty of due care owed by the Pitzers. The applicable principle of tort law is set out in section 324A(b) of the Restatement (Second) of Torts, which reads as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> . . . .
>
> (b) he has undertaken to perform a duty owed by the other to the third person. . . .

Parsing the Restatement, we see that any liability on the part of Schum in this case must be based on:

1.  The presence of a duty to Jason on the part of Pitzer to protect Jason and others from the risk of harm by the pit bulldog. (That there was such a duty has been adjudicated by the judgment of liability against the Pitzers in this case.)

2.  An undertaking by Schum of the duty, or a portion of it, owed by Pitzer to Jason.

3.  Negligence on the part of Schum in the performance of that duty.

The facts in this case, taken in the light most favorable to Jason, seem to support a conclusion that to some degree at least Schum undertook the task of securing the pit bulldog and of keeping him from escaping and becoming dangerously at large.[2] If Schum did undertake to share the Pitzers' duty of protecting the public from an escaped and dangerous pit bulldog, there is little or no question that he acted in a negligent manner. The most important question before us, then, becomes whether Schum undertook or partially undertook Pitzers' duty to protect Jason and others from harm.

First, it should be noted that the mere advice or warning by one person to another that care should be taken to avoid a certain risk does not in itself create an undertaking and consequent liability on the part of one giving such advice. Had Denise Austin, for example, extracted a promise from the Pitzers that the dog would be kept chained as a means of protection against the risk of harm

---

[2]The dissent does not seem to take into account the rule in *Turpel* that landlords are not excepted from general tort responsibility just because they are landlords. It must be recognized that here, as in *Turpel*, the *general* liability (not liability *as* a landlord) arises out of the defendant's status as a landlord. In *Turpel* the general duty to passersby arose out of the landlord's duty to maintain smoke alarms. In the present case the general duty to passersby arose out of the landlord's *undertaking* to protect others from the dangers of an escaped pit bulldog. We note that Schum's undertaking goes beyond a "mere acquiescence," as Schum's conduct is described in the dissent. Schum was much more than a passive observer of Pitzers' management of the dog. Schum intended to and did influence and control the conduct of his tenants. "Control" means "[t]o exercise authority or dominating influence over; direct; regulate." "Influence" is "[t]o have power over; affect." Donnell v. Cal. Western School of Law, 246 Cal.Rptr. 199, 206 n.1 (Cal.App. 4 Dist. 1988) (Wiener, J., dissenting). In this case, Schum affirmatively controlled the Pitzers' actions by threatening to use his power of eviction.

> Q:   [y]ou told them that if there were any more problems involving their pets, that they would be evicted?
> A:   I mentioned eviction when I first called. I said, "I want you to take care of this problem or get rid of that dog. . . ."

The Schum-Pitzer agreement amounted to more than passive compliance or "failure to make any objections" (Black's Law Dictionary 22 (5th ed. 1979)) on the part of Schum. Had Schum not exerted his power as a landlord, threatening eviction if an agreement were not reached relative to the "dog problem," then perhaps he could be said merely to have "acquiesced." Under the stated circumstances, however, a jury would be entitled to conclude that there was an undertaking by Schum that amounted to more than "mere acquiescence."

by the dog, Denise Austin could not be held liable simply because she had tried to get Pitzer to secure the dog and was ineffectual in keeping the dog from doing harm. Trying to prevent harm by warning or advising is certainly not the kind of "undertaking" contemplated by the quoted Restatement section. The present case is different from this, however. Schum clearly had the *power* to enforce his demand that Pitzer "take care" of the dangerous dog problem Schum was in a position to tell the Pitzers to make the dog safe or move out. The difference between the Austin example and the case before us is that the example involves only a failure to intervene; whereas, Schum has negligently caused injury to another rather than merely failing to avert injury. Once Schum used his power to evict in order to protect the world against this dangerous dog, he undertook a duty to exercise due care. His duty was not to his tenant nor to invitees of his tenant, as would be the case in a typical landlord liability case; Schum's duty is to the world. It is true that he could not have undertaken this duty absent his power over his tenant, but it is this power that enabled him to assume responsibility for the proper security of the dog against potential victims were the dog to escape. Thus, we have a situation in which the two, Schum and Pitzer, at the enforceable request and insistence of Schum, put together a plan for making the dog's continued presence on the premises safe and secure and of no risk to others. Schum and Pitzer then came to a mutual understanding that Pitzer would be allowed by Schum to remain on the premises provided that Pitzer promised to keep the dog in the house or on a chain. This kind of forced agreement goes beyond a mere request or suggestion by Schum to Pitzer. For reasons best known to Schum, Schum acceded to Denise Austin's urging that he *do* something about the dangerous dog. What Schum *did* was, using his power and authority over Pitzer, to *assume* the duty or obligation of securing the dog. Schum had the power to control the acts of the Pitzers in protecting the public (not necessarily invitees or others having some connection to the rented premises). In controlling the Pitzers' handling of the dog problem, Schum became a collaborator in the necessary precautionary steps needed in order to make a dangerous dog safe and became responsible for exercising due care in doing so.

In Garrison Retirement Home Corp. v. Hancock, 484 So.2d 1257 (Fla.App. 1985), a retirement home management assumed the duty of care and supervision of elderly tenants driving vehicles on the premises. As in the case of Schum, the owner had no initial duty to protect anyone against negligent drivers; however, once the owners assumed the duty to supervise and exert control over the vehicular operation of its tenants, and exerted its control

over these drivers, it had to do so in a reasonably prudent manner. Its failure to control prudently, once control was undertaken, made the retirement home liable for its negligent undertaking to supervise and control its tenants.

Schum as landlord had no initial duty to protect Jason and others from injuries caused by his tenants' escaped pit bulldog. However, once he was cajoled by Denise Austin into *doing* something about the dog and then *did* something by way of enforcing a rather specific plan for securing the dog, he was in a position of having engaged in an undertaking to assure performance of Pitzers' duty to protect others against the risk of dog attack. This undertaking was not possible without the power that Schum had to impose the terms of the undertaking; but, still, Schum's duty to the world, and his duty to Jason, was a duty as an ordinary person and not as a landlord.

The only remaining question is whether Schum's enforcement of the mutually agreed upon dog protection plan was reasonable and prudent under the circumstances. It must be remembered that the gate on the front fence was broken and firmly wedged in a manner that would allow the dog to escape from the front yard if he gained access to that area. All concerned knew about this defect. To think that a dangerous dog could be contained, given this opening in the front yard, by the mere promise of the house occupants to keep the dog in the house is to ignore the nature of most dogs. Most dogs, as did the pit bulldog in this case, will walk out of a door ajar. This dog simply walked out of a door left open, through the aperture of the broken gate, onto the sidewalk and proceeded to the point where Jason unfortunately appeared on the scene.

Under the evidence adduced in this case a jury could have found that Schum was at least partially legally responsible for the tragedy that resulted in Jason's permanent disfigurement by finding that Schum shared in, that he partially assumed, that he undertook the task, initially Pitzers' task alone, of protecting the world from this pit bulldog. We, of course, are not saying that Schum was negligent as a matter of law; what we are saying is that Schum is not *non-negligent* as a matter of law.

In sum, what we have here is this: Schum, going beyond his role as mere owner and landlord, decided to eliminate the risks associated with his tenants' keeping a pit bulldog on the rental premises. Using his power of eviction to force compliance with his intentions, Schum undertook to "take care of the problem" of a dangerous dog. He took care of the problem in a very imperfect and predictably hazardous manner when he agreed with the

Pitzers to let Buddy remain on rented premises that had an obviously insecure perimeter, with the only security against the dog's escape being the tenants' agreement with Schum that the dog would remain in the house or on a chain. The arguable unreasonableness of what Schum did in undertaking to take care of the dog problem became clearer as time went on. *After* the keep-the-dog-chained-or-in-the-house security plan was instituted by Schum and the Pitzers, the dog again escaped and ravaged another dog; and, also, Schum remained aware[3] of the wedged-open gate.

When one looks at these circumstances, at what Schum knew or should have known about the dog, at Schum's joining with the Pitzers in undertaking to share in the Pitzers' duty to deal with "the problem," at the likelihood that serious injury would result if the dog were to escape from the yard, and at the relatively slight burden of eliminating the risk, it is not difficult to conclude that Schum could have properly and lawfully been found negligent by a jury in this case. We, therefore, reverse the judgment of the trial court and reinstate Jason's action for negligence against John Schum.[4]

MOWBRAY and ROSE, JJ., concur.

YOUNG, C. J., with whom STEFFEN, J., agrees, dissenting:

I submit that the result of the majority's decision will be the expansion of landlord liability in this state. It could make landlords liable for injuries suffered by third parties a substantial distance from the landlord's property as a result of a tenant's tortious conduct.

While courts may impose legal duties when none existed previously, such an imposition should be exercised with extreme care. Georgianna v. Gizzy, 483 N.Y.S.2d 892, 894 (App.Div. 1984). Generally, when a landlord is out of possession of leased property and the tenant has exclusive control of the premises, the landlord is not responsible for injuries from animals kept by tenants on the leased property. Vigil By and Through Vigil v. Payne, 725 P.2d 1155, 1157 (Colo.Ct.App. 1986). When courts have found liability, it is predicated upon existence of two criteria: (1) the landlord's actual knowledge of the animal's vicious propensities, and

---

[3]Schum testified that he first became aware of the broken gate shortly after he leased the premises to the Pitzers. At that time Schum would frequently drive by the house on his way to his girlfriend's home.

[4]THE HONORABLE ROBERT E. ROSE, Justice, participated in the decision of this appeal on the record, briefs and recording of the oral argument.

(2) the landlord's retention of substantial control over the premises. *Georgianna,* 483 N.Y.S.2d at 893. Neither element is present in this case.

When the premises were leased, Schum was informed only that the tenants had a "small to medium-sized house dog." It is not uncommon for dogs to fight amongst themselves. Knowledge of a dog's propensity to attack other dogs is not the equivalent of knowledge that the dog will attack a human being. Banks v. Adair, 251 S.E.2d 88, 89 (Ga.Ct.App. 1978). No evidence exists to indicate that Schum knew of the likelihood of an attack by Buddy upon a person. Thus, the "actual knowledge" requirement is missing in this case.

Nor does the evidence suggest that Schum retained substantial control over the premises after he gave up possession to the Pitzers. Absent an agreement to the contrary, the lessor surrenders both possession and control of the land to the lessee, retaining only a reversionary interest. Strunk v. Zoltanski, 466 N.Y.S.2d 716, 717 (App.Div. 1983). Although the lease agreement reserved to Schum the right to enter and inspect the premises, and to approve or veto any repairs or alterations, Schum did not reserve any portion of the property for his own use. Inasmuch as Schum did not maintain substantial control over the leased premises, the second *Georgianna* criterion is also absent. Therefore, under generally recognized case law, liability does not exist in this case.

According to the majority, however, Schum's liability rests on his negligent undertaking of a duty owed by the Pitzers to safeguard passersby who might receive injuries from the Pitzers' dog.[1] The record indicates that after Schum discussed their dog's

---

[1]The majority contends that Schum's duty arises from section 324A of the Restatement (Second) of Torts. That section provides:

> One who undertakes, gratuitously, or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) *he has undertaken to perform a duty owed by the other to the third person,* or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

(Majority's emphasis.)

However, as described herein, Schum never undertook to perform a duty owed by the Pitzers to third parties. Therefore, section 324A is inapposite to the instant case.

behavior with the Pitzers, the Pitzers agreed to keep the dog in the house or on a chain. Obviously, the Pitzers did not properly implement this plan, or else this tragedy would not have occurred. However, Schum's discussion with the Pitzers as to how their dog might be maintained more securely is *not equivalent to the landlord undertaking a duty owed by the tenant to third parties* to restrain the dog's aggressive behavior.[2]

The majority concedes that "Schum cannot be held liable by reason of his status as a landlord." Nevertheless, it concludes that Schum's mere acquiescence in a plan (negligently implemented by the Pitzers) to keep the dog on a chain or in the house somehow spawned what appears to be an unlimited duty to anyone injured by the dog whether on the premises, nearby the premises, or blocks away.

The majority cites Garrison Retirement Home Corp. v. Hancock, 484 So.2d 1257 (Fla.App.Dist. 1985), as authority for its contention that Schum undertook to assure performance of the Pitzers' duty to protect others against the risk of a dog attack. However, *Garrison* involved a retirement home with a professional responsibility to supervise and control the activities of its mostly senile, elderly residents. In this case, Schum wielded neither substantial power nor control over his tenants' conduct. His mere acquiescence in the Pitzers' plan to control their dog falls far short of the professional obligation owed by the appellant retirement home in *Garrison*. Therefore, *Garrison* is clearly distinguishable from the case at hand.

The majority asserts that landlord status is not part of the liability equation. Ironically, however, it bases its theory of liability on the idea that Schum, "using his *power and authority* [as a landlord] over Pitzer," assumed the duty of securing the dog. (Emphasis added.) Although the majority would find an undertaking in this case on the ground that Schum (again as a landlord!) had the power to control the acts of the Pitzers in protecting the public, we believe that this "power" is illusory. As discussed above, Schum surrendered both possession and control of his property to the Pitzers. Strunk v. Zoltanski, 466 N.Y.S.2d 716, 717 (App.Div. 1983). Without maintaining substantial con-

---

[2]The majority characterizes the result of this discussion as a "forced agreement" in which "Schum and Pitzer then came to a mutual understanding that Pitzer would be allowed by Schum to remain on the premises provided that Pitzer promised to keep the dog in the house or on the chain." However, at trial, Schum testified that he believed that he had no legal right to evict the Pitzers. Accordingly, the record belies the majority's suggestion that Schum imposed on the Pitzers a plan for controlling the dog.

trol over the leased premises, we fail to comprehend how Schum had the power to control his lessees.

Moreover, although the majority finds that mere advice or warning would not create an undertaking, it fails to define any real parameters for the duty perceived by it when one, not a landlord, offers to assist with a problem created by another's negligence. If a friend of the tenants had offered assistance in chaining the dog, would that friend thereafter be liable for injuries caused by the dog? What if a neighbor complained to the landlord that instead of a dog, the tenants had a teen-age son who drank to excess before driving? Would the landlord be liable if he suggested to the tenant that the son should be allowed to drive only under carefully monitored conditions, and thereafter the tenant's son, while driving under the influence, injured a third party? It is easy to envision an almost infinite variety of circumstances when a lessor of property—agricultural, commercial or residential—if advised of the questionable deportment of a lessee, might, under the rationale of the majority, be called upon to respond in damages. Until we can devise rational limits for this novel theory, it would be irresponsible to unleash such a doctrine in our increasingly litigious society.

The majority cites Turpel v. Sayles, 101 Nev. 35, 692 P.2d 1290 (1985), for the proposition that a landlord could be liable for negligence not as a landlord or owner, but because of a failure to exercise care not to subject others to an unreasonable risk of harm. However, as the majority admits, in *Turpel,* the property owner's "duty of reasonable care" was related to her position as an owner/landlord, and she would have incurred "no duty apart from this status."

In the instant case, the majority introduces its rationale for Schum's liability with the following: "Schum, going beyond his role as mere owner and landlord, decided to eliminate the risks associated with his tenants' keeping a pit bulldog on the rental premises." However, the majority goes on to declare that "[u]sing his [landlord's] *power of eviction*[3] to force compliance with his intentions, Schum undertook to 'take care of the problem' of a dangerous dog." (Emphasis added.) Accordingly, the majority is unable to divorce Schum's status as a landlord from his role in this case.

---

[3]Ironically, although the majority disclaims any relationship between Schum's landlord status and his liability in this case, it emphasizes that Schum had the "power of eviction" over the Pitzers. However, eviction of a tenant is commonly a difficult and frustrating process. Thus, the majority ignores the reality of contemporary landlord-tenant relations when it implies that Schum could have easily resolved the situation by evicting the Pitzers.

Thus, the general duty my colleagues perceive herein of reasonable care to third parties is in reality a duty of care *as a landlord*. This is the cornerstone of the majority's finding of liability. Whether elliptically or candidly embraced, such a doctrine will bring a harvest of increasing litigation in claimants' ceaseless quest for more defendants and deeper pockets.

Moreover, once our courts find landlords liable to third parties for negligence of tenants, imposition of strict liability on landlords may not be far behind. Love, *Landlord's Liability for Defective Premises: Caveat Lessee, Negligence, or Strict Liability,* 1975 Wis. L. Rev. 19, 157-158. Courts might feel an irresistible temptation to impose strict liability on the theory that, as the "deep pocket," a landlord is in the best position to bear and distribute the risks of loss attributable to the business of leasing. *Id.* This contingency, as well as the liability imposed by the majority herein, would have profound implications for property owners—and for renters who will eventually bear this burden.

A landlord is not an insurer of his tenant's safety, nor of the safety of the people whom his tenant invites onto the leased property. Strunk v. Zoltanski, 466 N.Y.S.2d 716, 719 (App.Div. 1983) (Rubin, J., dissenting). Moreover, when a landlord has delivered possession and control of his property to a tenant, he should not, absent the unique circumstances defined in *Georgianna,* 483 N.Y.S.2d at 893, be held liable to third persons for injuries sustained as a result of misconduct of the tenant. National Tea v. Gaylord Discount Dept. Stores, 427 N.E.2d 345, 348 (Ill.App.Ct. 1981). With regard to third persons, tenants occupy a position on a parity with that of an owner in possession. Knox v. Gray, 712 S.W.2d 914, 915 (Ark. 1986). If society wants the above well recognized principles changed to create additional defendants, it should be done by a legislative act, not by judicial decision.

Since Jason Wright may bring a cause of action for negligence against the Pitzers, he is not without a legal remedy. Therefore, I would affirm the decision of the district court.