Maupin, J.,
with whom Shearing, J., joins, concurring in part and dissenting in part:
I join that part of the court’s opinion reversing the Mahlums’ intentional tort claims, but I would reverse the judgment in its entirety. I therefore dissent from the majority’s decision to affirm the Mahlums’ negligent undertaking claim.
As the majority notes, Dow Chemical and Corning Incorporated formed Dow Corning in 1943 to explore, develop, and undoubtedly, profit from silicone technology. From its inception, Dow Corning has maintained an impenetrable, separate corporate identity from its two parent corporations, such that the Mahlums abandoned any attempt to “pierce” the corporate veil dividing Dow Corning from Dow Chemical (at least as that term is used in the traditional sense).
Precluded from pursuing claims against Dow Chemical based on derivative liability, the Mahlums sought to establish that Dow Chemical, by its own actions, was responsible for the injuries to *1521 Mrs. Mahlum allegedly caused by Dow Coming’s silicone breast implants.[1] At trial, the Mahlums succeeded in convincing the jury that Dow Chemical was liable for several intentional torts, as well as the tort of negligent performance of an undertaking.
The jury found Dow Chemical liable for the negligent performance of an undertaking pursuant to Restatement (Second) of Torts § 324A. The definition of this tort, often referred to as the Good Samaritan rule, is as follows:
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to perform his undertaking if
(a) his failure to exercise reasonable care increases the risk of such harm or
(b) he has undertaken to perform a duty owed by the other to the third person or
(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.
Restatement (Second) of Torts § 324A (1979) [hereinafter section 324A],
I find the majority’s analysis of the section 324A claim against Dow Chemical troubling for several reasons.
First, the majority appears to ignore a basic and, by any standards, a reasonable precept regarding duty in a negligent undertaking action: that a plaintiff asserting a section 324A claim must show that the defendant specifically undertook to perform the task that he is charged to have performed negligently. See In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig., 113 F.3d 1484, 1493 (8th Cir. 1997) (“TMJ Implants”) (“The scope of th[e] undertaking defines and limits an actor’s duty under section 324A.”). Further, a close examination of the tests of liquid silicone does not show that Dow Chemical undertook a duty to ensure the safety of the final product, silicone gel breast implants.
Second, even assuming that Dow Chemical did undertake to perform safety-testing of the silicone fluid that five to ten years later came to be used in Dow Coming’s breast implants, the *1522 majority fails to cite any evidence in the record demonstrating that Dow Chemical negligently performed that undertaking.
Third, the majority fails plausibly to show the proximate nexus between this alleged breach and the harm that Charlotte Mahlum suffered.
Fourth, the result of the majority’s decision is that a research facility that tests some component, with or without knowledge of its purpose, may now be deemed to have undertaken an everlasting duty to supervise, monitor, and control a manufacturer’s use of the component in any and all future products, or face infinite liability.

DOW CHEMICAL’S ALLEGED UNDERTAKING AND DUTY

Like any other claim of negligence, a threshold element of a negligent undertaking claim is the existence of a duty to use due care towards another’s legally protected interest. See Perez v. Las Vegas Medical Center, 107 Nev. 1, 4, 805 P.2d 589, 590-91 (1991) (observing that to prevail on a negligence theory, the plaintiff generally must show five elements, the first of which is that the defendant had a duty to exercise due care towards the plaintiff). In determining whether such a duty exists, this court has held that it is the courts and not juries that have the ultimate responsibility to define the scope of duty in relation to particular circumstances and to define the legal standard of reasonable conduct in light of the apparent risk. See Ashwood v. Clark County, 113 Nev. 80, 84, 930 P.2d 740, 742 (1997). Consequently, whether evidence presented by the plaintiffs is sufficient to create a legally cognizable duty is a question for the courts. See Artiglio v. Corning Inc., 957 P.2d 1313, 1318 (Cal. 1998) (“Whether this essential prerequisite to a negligence cause of action has been satisfied in a particular case is a question of law to be resolved by the court.”); Smith v. Allendale Mut. Ins. Co., 303 N.W.2d 702, 710 (Mich. 1981) (rejecting argument that the extent and nature of an undertaking under section 324A are questions of fact for the jury; rather, it is “for the court to determine what evidence is minimally necessary to establish the elements of a relationship on which tort liability may be premised”); Matter of New York State Silicone Breast Implant Litig., 632 N.Y.S.2d 953 (Sup. Ct. 1995) (“Matter of N.Y. State Silicone”) (addressing a similar claim of negligent undertaking against Dow Chemical by breast implant recipients, holding that “the question of whether a duty is owed in the first instance is a legal issue to be resolved by the court”), aff’d, 642 N.Y.S.2d 681, appeal dismissed, 676 N.E.2d 493 (N.Y. 1996). There is insufficient evidence in the record to sup *1523 port a conclusion that Dow Chemical owed a duty towards Dow Coming’s breast implant recipients.[2]
Other courts confronted with similar facts have found no duty under section 324A. A New York court concluded that Dow Chemical lacked a duty to the ultimate purchasers of breast implants because: (1) there was only a “tenuous connection” between Dow Chemical and those ultimate purchasers, (2) Dow Chemical never provided or undertook to provide the plaintiffs with any services, any information, or any product, (3) there was no evidence that the ultimate purchasers of the breast implants ever relied on Dow Chemical or on any information that Dow Chemical provided to Dow Corning in making a decision to purchase breast implants, and (4) there is no evidence that Dow Chemical had any contact with the plaintiffs or knew their identity. Matter of N.Y. State Silicone, 632 N.Y.S.2d at 956. “Thus, plaintiffs cannot establish a sufficient relationship between themselves and Dow Chemical to justify imposing a duty on Dow Chemical.” Id. The court made further observations that are important to note:
“While moral and logical judgments are significant components of the analysis, we are also bound to consider the larger social consequences of our decisions and to tailor our notion of duty so that ‘the legal consequences of wrongs [are limited] to a controllable degree.’ ”
[The New York Court of Appeals] has “limited the universe of permissible plaintiffs because a failure to do so would impose a duty of reasonable care enforceable by any member of an indeterminate class of persons, present and prospective, known and unknown, directly or indirectly injured by any negligence.” The court noted that “[t]he hazards of a business conducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implication of a duty that exposes to these consequences.”
Although Dow Chemical may have had a duty to the actual users of its research such as Dow Corning, that liability does *1524 not extend ad infinitum to any potential ultimate user of a product which contains a silicone component. Dow Corning has over the years been in the business of manufacturing silicone related products for thousands of applications. If this court were to hold that Dow Chemical assumed a duty of care based on its silicone related testing and consulting to every potential ultimate consumer of a product which contained silicone, the duty imposed on Dow Chemical would be indeterminate and infinite.
Id. at 955, 956-57 (quoting Waters v. New York City Housing Authority, 505 N.E.2d 922 (N.Y. 1987), and Eiseman v. State of New York, 511 N.E.2d 1128 (N.Y. 1987)). The Appellate Division affirmed the court’s decision, concluding that “[a] party who gives advice to a manufacturer of consumer goods does not owe a duty to then-unknown individual purchasers of the manufacturer’s goods[.]” In re N.Y. State Silicone, 642 N.Y.S.2d at 682. I believe, as the New York court did, that to impose liability on Dow Chemical under these facts would be to endorse a duty that is indeterminate and infinite.
Likewise, the Eighth Circuit Court of Appeals noted that “[a]n actor’s specific undertaking of the services allegedly performed without reasonable care is a threshold requirement to section 324A liability. . . . Accordingly, courts have refused to impose liability under section 324A without a showing that the defendant undertook a duty with respect to the specific product that caused the injury.” TMJ Implants, 113 F.3d at 1493 (citations omitted). The TMJ Implants court concluded that, to establish liability under section 324A, plaintiffs had to prove that Dow Chemical undertook a duty with respect to TMJ implants. Id. Like the plaintiffs in our case, the TMJ plaintiffs argued that Dow Chemical assumed such a duty by “undertaking to render services to Dow Corning through its trademark agreements with Dow Corning and through its silicone research and testing performed for Dow Corning and that Dow Chemical should have recognized that these services were necessary for the protection of plaintiffs.’ ’ Id.[3] The TMJ court concluded that Dow Chemical did not undertake a duty, either under the trademark agreement, or through silicone testing, or because Dow Corning lacked an adequate laboratory.
The silicone research allegedly performed by Dow Chemical at the request of Dow Corning also does not demonstrate an undertaking sufficient to impose liability on Dow Chemical under section 324A. For section 324A liabil *1525 ity to attach, Dow Chemical must have specifically undertaken the task of ensuring the safety of Dow Coming’s TMJ implants or of ensuring the safety of Dow Coming’s entire array of silicone products. Plaintiffs contend that Dow Chemical undertook a duty with respect to all of Dow Coming’s silicone products, but the record shows that Dow Chemical never tested the use of silicone in any medical implants and that Dow Chemical never was informed that any of the silicone it tested would be used in medical implants. . . . [¶] Plaintiffs can point only to Dow Chemical’s performance of approximately a dozen tests involving silicone (but not its use in medical implants) performed over four decades at the request of Dow Corning, ... a 1948 and a 1950 article published by three Dow Chemical scientists [i.e., the articles by Dr. Rowe] discussing toxicological research on various silicone, and a trademark agreement allowing Dow Chemical to inspect the quality of Dow Coming’s products. However, these Dow Chemical actions and Dow Coming’s purportedly inadequate laboratory facilities are insufficient to establish an undertaking of such breadth and magnitude as to create a duty on the part [of] Dow Chemical to ensure the safety of all of Dow Coming’s silicone products.
TMJ Implants, 113 F.3d at 1495 (citations and footnote omitted).
In addition, the California Supreme Court held that silicone breast implant plaintiffs failed to make a case under section 324A based on much of the same evidence that is now before this court. See Artiglio, 957 P.2d at 1318-21. The Artiglio court noted:
“The foundational requirement of [section 324A] is that in order for liability to be imposed upon the actor, he must specifically have undertaken to perform the task that he is charged with having performed negligently, for without the actual assumption of the undertaking there can be no correlative duty to perform that undertaking carefully.”
Id. at 1318 (quoting Blessing v. United States, 447 F. Supp. 1160, 1188-89 (E.D. Pa. 1978)). After reviewing the evidence the court stated:
In sum, the record before the trial court on summary judgment would not support a finding that Dow Chemical’s was “an undertaking of such breadth and magnitude as to create a duty on the part of Dow Chemical to ensure the safety of all of Dow Coming’s silicone products.” Moreover, many years elapsed between Dow Chemical’s seminal toxicology research activities on behalf of Dow Corning and plaintiffs’ *1526 alleged injuries. When that research was done, any possible consequence for plaintiffs — who years later allegedly received medical treatments traceable to its influence — was exceedingly attenuated and remote. We conclude that, at the times Dow Chemical allegedly conducted or reported for Dow Corning the toxicology research services on which plaintiffs premise their section 324A claim, it cannot reasonably be concluded that Dow Chemical “should [have] recognize[d] ” those services were “necessary for the protection of” (§ 324A) plaintiffs. Accordingly, under the theory articulated in section 324A, no duty of care running to plaintiffs arose from Dow Chemical’s undertaking.
Artiglio, 957 P.2d at 1320 (alteration in original) (quoting TMJ Implants, 113 F.3d at 1495, and section 324A).
The Mahlums cite Wright v. Schum, 105 Nev. 611, 781 P.2d 1142 (1989), for the proposition that a duty arises when a defendant asserts control over a person for whom that defendant undertakes a task. In Wright, our only prior case specifically dealing with a section 324A claim, a tenant’s dog escaped the premises, and attacked and severely injured a child. Prior to the incident, the landlord had voluntarily implemented safety measures to have the dog secured within the tenant’s yard, for the protection of the general public. The evidence showed that the landlord had exercised his control over the tenant’s behavior by threatening eviction if the tenant did not comply with the request to secure the dog. Because the landlord had assumed to some degree the duty of securing the dog — originally only the tenant’s duty — and then negligently performed that duty, the negligent undertaking claim against the landlord was allowed to go before a jury. Id.
The case at bar bears little resemblance to the facts in Wright. That Dow Corning lacked a toxicology laboratory until 1968 and commissioned Dow Chemical to perform various toxicology tests provides no reasonable basis for concluding that Dow Chemical “controlled” Dow Coming’s development or testing of breast implants. The other evidence in support of this contention, including the trademark agreement, also fails to establish such an inference. Accordingly, the evidence was legally insufficient to show that Dow Chemical controlled Dow Corning regarding the creation and safety of its breast implants.[4]
*1527 The Mahlums argue that the trademark agreement between Dow Chemical and Dow Corning is indicative of an undertaking and of control. The trademark agreement, however, does not, in my view, support the liability claims brought by the Mahlums. In 1975, Dow Corning and Dow Chemical memorialized an agreement in which Dow Chemical licensed the “Dow” trademark to Dow Coming. The agreement recited that Dow Chemical had established a valuable reputation under its corporate name “Dow.” The agreement confirmed and ratified Dow Coming’s use of the Dow mark, so that the valuable reputation established in the name Dow would be passed on to Dow Corning. The agreement also provided as follows:
The products manufactured, distributed and sold or any services rendered under The Corporate Title [Dow Corning Corporation], The Trade Name [Dow Corning], The Design Trademark [double rectangle], or other trademarks containing, consisting of or comprising “DOW CORNING” shall be of a nature and quality that is acceptable to Dow [Chemical] Company and shall not damage or reflect adversely on the reputation or goodwill associated with the name and mark “DOW”. When requested, [Dow Coming] shall at reasonable times and places submit specimens of its products to Dow [Chemical] Company and shall permit inspection of [Dow Coming’s] premises at reasonable times ... to examine the quality of such products.
The agreement stated that Dow Chemical and Coming had “controlled” the operations and the quality of goods and services of Dow Corning since that company’s inception in 1943. Id. Dow Chemical thus maintained the authority to approve products using the Dow Corning mark. Dow Chemical could also require that Dow Corning terminate all use of the name Dow or any product not approved by Dow Chemical.
The Mahlums argued at trial and on appeal that the agreement demonstrated that Dow Chemical controlled the operations of Dow Corning and that Dow Chemical had the right to inspect and approve Dow Coming’s breast implants. Dow Chemical argued that the agreement has little significance and that the language regarding control was required under the Lanham Trademark Act of 1946, 15 U.S.C. § 1051. According to Dow Chemical, there is. no evidence that Dow Chemical exercised any control under this agreement regarding Dow Coming’s breast implants. The head of Dow Coming’s breast implant business testified that Dow Chemical never exercised any control over Dow Coming’s breast implant business, and that he never knew of the agreement’s existence.
*1528 One of the leading authorities on trademarks states that “[¡licensing a mark without adequate control over the quality of goods or services sold under the mark by the licensee may cause the mark to lose its significance as a symbol of equal quality— hence, abandonment.” J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 17:6, at 17-6 (4th ed. 1998) (McCarthy). “Today, trademark licensing is permitted so long as the licensor maintains adequate control over the nature and quality of goods and services sold under the mark by the licensee.” Id., § 18:42, at 18-66. The licensor thus has a duty to control the quality of the goods and services sold under the mark; if it fails to do so, it may forfeit its right to the mark. See id., §§ 18:66-68; Dawn Donut Co. v. Hart’s Food Stores, Inc., 267 F.2d 358 (2d Cir. 1959).
In this case, no significance should attach to the agreement as evidence of Dow Chemical’s “control” of Dow Corning, or evidence of conspiracy or concert of action to make misrepresentations to consumers of Dow Coming’s breast implants. The “control” language was almost certainly placed in the agreement to protect Dow’s right to the name “Dow” when associated with the “Dow Corning” mark. There is no evidence that Dow Chemical exercised any control or even inspected Dow Coming’s breast implants under this agreement. Indeed, the evidence is that it did not.
In another silicone breast implant case, Artiglio, the California Supreme Court stated, “[w]hile the trademark and tradename agreements may have conferred upon Dow Chemical certain inspection rights, there is no suggestion that the agreements imposed a duty to perform tests, let alone that they constituted a general undertaking by Dow Chemical to guarantee the safety of Dow Coming’s silicone product lines.” Artiglio, 957 P.2d at 1320. The court found no evidence that Dow Chemical inspected any Dow Corning product or provided any service to Dow Corning pursuant to such agreements. Id. As noted above, the Artiglio court ultimately rejected the claim that Dow Chemical was liable under section 324A.
The Eighth Circuit Court of Appeals reached a similar decision in TMJ Implants. In that case, the Eighth Circuit considered the trademark agreement at hand pursuant to an argument that Dow Chemical was liable under a theory of negligent undertaking for damages caused by Dow Corning TMJ products. Plaintiffs argued that Dow Chemical assumed a duty with respect to TMJ implants by undertaking to render services to Dow Corning through trademark agreements. The Eighth Circuit rejected the argument:
The record . . . contains no evidence to show that Dow Chemical undertook to render services to Dow Corning *1529 through its trademark agreements. A standard trademark agreement, in and of itself, does not establish an affirmative duty to inspect that could result in tort liability to third parties, and nothing in the record suggests that these are other than standard trademark agreements. Plaintiffs can point to no evidence that Dow Chemical in fact inspected any Dow Corning product or provided any services to Dow Corning pursuant to these agreements. These agreements can only be viewed, then, as a vehicle for Dow Chemical to protect its intellectual property rights, and thus they do not represent an undertaking on the part of Dow Chemical to render services to another. Accordingly, these agreements do not trigger section 324A.
TMJ Implants, 113 F.3d at 1494 (citations omitted).
In other product liability cases, plaintiffs have argued that the existence of control language in a trademark agreement can make a defendant licensor liable for failure to inspect a product bearing its trademark but made by another company. But existence of language of control in such an agreement does not make the licensor liable for defects in the licensee’s products.
Under this body of law, the sole consequence of a trademark owner’s failure to exercise control over its licensees is the potential loss of the rights associated with the trademark. None of these cases suggests, in any way, that a trademark owner’s failure to exercise control subjects the owner to affirmative liability in tort for damages caused by a defective product bearing its trademark.
Burkert v. Petrol Plus of Naugatuck, Inc., 579 A.2d 26, 32 (Conn. 1990) (citing S. Sandrock, Tort Liability of a Non-Manufacturing Franchisor for Acts of Its Franchisee, 48 U. Cinn. L. Rev. 699, 706 (1979)).
Like the plaintiffs in Artiglio and TMJ Implants, the Mahlums argue that Dow Chemical assumed a duty of care towards them by performing certain toxicological tests on liquid silicone for Dow Corning and by maintaining a “relationship of control” over Dow Corning. They rely on Dow Chemical toxicologist Dr. V. K. Rowe’s various connections to Dow Coming’s silicone testing as a basis for Dow Chemical’s undertaking of this duty. My review of the record compels me to disagree.
The Mahlums and the majority emphasize, without fully describing their nature, the multitude of toxicological tests Dow Chemical performed for Dow Corning from the 1940s into the 1960s.[5] Given their obvious importance, a closer review of what *1530 these tests revealed appears warranted. There are over a hundred tests in the record comprising the so-called “component testing” Dow Chemical performed for Dow Corning. Nearly all of these tests are what are termed toxicological “industrial handling” tests: i.e., the purpose of these tests is to discover what safety measures should be undertaken by the employees who handle the tested material in the manufacturing process. The following is an excerpt from a typical test report Dow Chemical submitted to Dow Corning from the 1940s into the 1960s:
Subject: THE RESULTS OF RANGE FINDING TOXICOLOGICAL TESTS ON METHYL HYDROGEN MIXED CYCLICS

PROBLEM

The sample of methyl hydrogen mixed cyclics which were [sic] submitted to us on September 4, 1956 is being handled for the preparation of foam resins. What precautions must be taken to handle this material safely?

CONCLUSIONS

This material has a low acute oral toxicity, the LD50 for rats being greater than 2 gm./kgm. of body weight. It is essentially without effect on contact with the eyes and with the skin, and apparently is not absorbed through the skin in acutely toxic amounts. Vapor concentration attainable at room temperature should not present a problem upon single vapor exposure. However, when the material is heated to 100°C very slight irritation to the eyes may be expected.
This material does not appear to present any unusual health hazards. The practice of ordinary care and cleanliness should be sufficient to avoid difficulties in handling.

These conclusions are based upon range finding toxicological tests and are limited to precautions for industrial handling of the material. The development of specific uses for this material will make it necessary to give careful consideration to the health problems presented and to the need for further toxicological studies.

(Emphasis added.)
This report exemplifies the type of testing Dow Chemical performed for Dow Corning prior to the invention of silicone breast implants in 1962; over a hundred other Dow Chemical toxicological reports in the record on Dow Coming’s silicone compounds *1531 mirror its format and language. Further, from time to time, Dow Corning would inform Dow Chemical of the potential use of the tested material. In such an instance, Dow Chemical often would include an opinion on the suitability of the substance for the contemplated use based on the available information provided by the range finding test; however, even these reports ended by specifically noting that the conclusions were ultimately reliable only as to industrial handling purposes and that any specific uses in products should undergo further, extensive toxicological testing. At most, these tests may support the hypothesis that Dow Chemical undertook a duty towards Dow Coming’s employees to competently test for potential handling hazards of Dow Coming’s chemical substances. Cf. Miller v. Bristol-Myers Co., 485 N.W.2d 31 (Wis. 1992) (holding that a parent corporation may be liable for unsafe conditions at a subsidiary where it assumed a duty to act by affirmatively undertaking to provide a safe working environment at the subsidiary).[6] These tests do not create, however, a reasonable inference that Dow Chemical undertook a duty to ensure the safety of Silastic breast implants, or any Dow Corning product for that matter, by testing Dow Coming’s silicone compounds for a limited purpose.[7]
Other tests the majority relies upon include the 1948 article co-written by Dr. Rowe, the 1956 Chenoweth study showing silicone migration, the 1957 Miami study showing that DC 200 fluid decreased the number of white blood cells in female rat tails, the 1967 dog miniature implant study, and the 1970 Sparschu pathology report showing migration of silicone to bond marrow.
The 1948 article, entitled Toxicological Studies on Certain Commercial Silicone and co-authored by Dow Chemical’s toxicologist, Dr. Rowe, was printed in the Journal of Industrial Hygiene and Toxicology, Vol. 30, No. 6, pp. 332-52. According to the Mahlums, this article misrepresented to the scientific com *1532 munity that silicone were harmless and posed no threat to human health. However, the purported misrepresentation that all silicone are inert was included in a section entitled “Discussion of Practical Handling Problems,” where it states that “[floxicological studies conducted with representative silicone materials show that the silicone as a group have a very low order of toxicity. When these materials are considered from a practical viewpoint, the hazards they present are exceedingly minor.” Once again, the article was specifically addressing industrial hazards. Further, the article does not represent that silicone have no toxicity whatsoever.[8] Rather, it reports skin and eye irritations observed in the test subjects, but concludes that industrial exposure to the substances presents no significant danger. The final sentence of the article concludes as follows: “Toxicological studies with laboratory animals have shown that the silicone (methyl and mixed methyl and phenylpolysiloxanes) as a class are very low in toxicity and that they present no significant handling problems.’ ’
Next, the 1956 Chenoweth study is an internal Dow Corning study conducted by two Dow Corning scientists and one Dow Chemical scientist, Dr. M. B. Chenoweth. It examined the physiological assimilation of the DC 200 fluid, which was a silicone fluid used for industrial purposes. DC 200 was mixed with an antifoam emulsion and orally administered to three animals: one albino rat and two dogs. No evidence of assimilation was found in the rat, but traces of siloxane were found throughout the bodies of both dogs. Another rat was given an intramuscular injection of the fluid, and siloxane was also found throughout its body in very low concentrations. This study did not address whether the trace amounts of siloxane found in the various organs of the animals harmed the animals or not. I also note that Dr. Chenoweth’s role in the study was comprised of “preoperative care, administering of the labeled fluid, sacrificing, and dissecting of the animals.”[9] The Dow Chemical radiochemical laboratory also “cooperated]” in the analysis of the tissue samples from the animals along with, it appears, Dow Coming’s analytical laboratory. Thus, this study was a Dow Corning study with some cooperation from *1533 Dow Chemical. There is nothing in Dow Chemical’s participation that would serve as a clear warning signal to Dow Chemical that the medical use of silicone should be abandoned.
The 1957 Miami study, the results of which showed that DC 200 fluid depressed the granulocytic elements of the tail blood of female rats, was not conducted by Dow Chemical. However, Dr. Rowe was approached by Dow Corning to set up the study, and he designed the test protocol for Professor Deichmann from the University of Miami. Two versions of this study were prepared by Professor Deichmann, one reporting on the effects of six silicone materials, and the other reporting only on five. The Mahlums argued at trial that the two Dow companies were in cohorts in either preparing or publishing the five materials report to conceal the harmñil effects of the sixth silicone material. This assertion is not supported by the record. First, the sixth material that was omitted in the report on five silicone materials is a substance identified only as “Z-4141,” and the Mahlums do not contend that Z-4141 is contained in Dow Coming’s breast implants. Thus, its effects, whether harmful or not, have no bearing on the Mahlums’ claims. Second, there is no evidence to suggest that Dow Chemical (via Dr. Rowe or otherwise) played any part in creating the second report. The evidence thus indicates that Dow Chemical had no role in attempting to hide the effects of “Z-4141.”[10]
The Mahlums also cite the 1970 pathology report prepared by a Dow Chemical scientist, Dr. Gary L. Sparschu, as another link establishing Dow Chemical’s undertaking to ensure the safety of silicone gel breast implants. This study injected rats, male and female, with different doses of DC 360, intraperitoneally and subcutaneously. The pathological results showed traces of the silicone fluid throughout the animals’ bodies, including the bone marrow. The male rats in one group showed decreased liver weights, and the female rats in another group had decreased brain weights. The report concluded, however, that “[tjhese findings do not appear to be associated with treatment because the effect is not dose related.” An inflammatory reaction was not associated with the deposition of DC 360 in the organs. Again, given that the Mahlums do not assert that Dow Chemical performed any of its tests negligently, and that this report found no significant dangers of DC 360, we are left only to speculate as to how this report also should have raised an alarm for Dow Chemical to publish this information.
*1534 In a letter from the independent laboratory, Food and Drug Research Laboratories, Inc. (FDRL), to Dow Corning in 1964, FDRL submitted a revised proposal on certain polysiloxane studies pursuant to Dow Coming’s modifications “as well as [its] conversations with Dr. V. K. Rowe at the Gordon Research Conference recently.” This is the only link connecting Dr. Rowe, and therefore Dow Chemical, to the 1964 polysiloxane dog studies performed by FDRL for Dow Corning. In 1964, FDRL began conducting a long-term (2 years) study of silicone migration (including that of DC 360 when injected) in animals and the extent to which the compounds remain in animal tissues. FDRL reported its results to Dow Corning in 1968.
In 1967, a second two-year study of miniature implants in dogs was performed by the same independent testing laboratory for Dow Corning. The evidence linking Dow Chemical to this study was that Dr. Rowe was one consultant among several who recommended that the study be done. These FDRL studies show that Dow Corning was not relying on Dow Chemical’s alleged undertaking as having established the safety of silicone gel breast implants.
The Mahlums conceded that Dow Chemical properly executed the tests that it performed for Dow Corning. Instead, the Mahlums alleged that Dow Chemical was negligent in failing to recommend further studies to ensure that silicone fluids could safely be used in its breast implants. The record, however, shows that Dow Chemical did make such a recommendation regarding Silastic implants. In 1967, Dr. Rowe recommended, presumably in his role as an advisor, to Dow Coming’s product safety committee that long-term testing of miniature implants in dogs be conducted to establish the safety of Silastic implants. In response to this recommendation, Dow Corning commissioned the 1967 FDRL long-term study.
In summary, proof at trial identified a series of tests that Dow Chemical performed for Dow Corning at Dow Coming’s request. Dow Chemical performed these studies and reported them to Dow Corning. There is no proof suggesting that Dow Chemical manipulated the results or failed to report them accurately to Dow Corning. It was then Dow Coming’s responsibility to interpret these tests and make decisions regarding the information contained therein regarding its product line. Dow Corning was a creature of state corporate law, a deliberately-created separate and economically independent entity that was specifically spun-off from Dow Chemical and Corning Incorporated in order to develop silicone for the marketplace. Dow Corning was not undercapital-ized, not created as a vehicle for fraud or abuse, and was subject to proper corporate formalities; it was not, in other words, an *1535 alter ego of Dow Chemical and/or Coming Incorporated. Dow Chemical did not undertake to perform tasks for Dow Corning that Dow Corning was specifically created to perform, namely, to design, manufacture, and market silicone products.

DOW CHEMICAL’S ALLEGED BREACH

As I stated earlier, the majority fails to cite any convincing evidence in the record demonstrating that Dow Chemical negligently performed the alleged undertaking. Dow Chemical’s breach, according to the majority, was that it failed to prevent Dow Corning from marketing silicone breast implants, given its relationship to the subsidiary as a parent corporation and as a consultant, and it failed to warn the public about the dangers of silicone breast implants. This analysis applies only if one concludes that Dow Chemical had a duty to control Dow Coming’s product decisions. There is no evidence in the record that Dow Chemical had any such duty.
The California Supreme Court in Artiglio stated that “‘[t]he duty of a “good Samaritan” is limited. Once he has performed his voluntary act he is not required to continue to render aid indefinitely.’” 957 P.2d at 1319 (quoting Baker v. City of Los Angeles, 233 Cal. Rptr. 760 (Ct. App. 1986)). “Thus, ‘a Good Samaritan who has performed a series of voluntary acts in the past is not thereafter required indefinitely to continue performing such acts into the future.’” Id. (quoting City of Santee v. County of San Diego, 259 Cal. Rptr. 757 (Ct. App. 1989)). It is undisputed that Dow Chemical performed what testing it did non-negligently. Legally, Dow Chemical was not obligated to do more. Dow Chemical was not under a permanent duty to keep track of Dow Coming’s silicone fluid products, ascertain whether such products were harmful, and manipulate Dow Corning into stopping production. Accordingly, it cannot be said that Dow Chemical breached any duty.

LACK OF PROXIMATE CAUSE

The majority concludes that Dow Chemical was negligent for failing to oversee and prevent Dow Corning from designing and marketing the breast implants when it had the “power” to do so. Even assuming negligence, Dow Chemical’s actions in the 1950s and 1960s cannot be the proximate cause of any harm to Mahlum after she received her breast implants in 1985.
Several reasons support my conclusion. First, when Dow Chemical performed silicone tests on DC 200 or DC 360 for Dow Corning prior to the invention of silicone gel breast implants, Dow Chemical could not have foreseen the uses to which Dow Corning would put these silicone fluids. In Artiglio, the California *1536 .Supreme Court noted that “many years elapsed between Dow Chemical’s seminal toxicology research activities on behalf of Dow Corning and plaintiffs’ alleged injuries. When that research was done, any possible consequence for plaintiffs — who years later allegedly received medical treatments traceable to its influence — was exceedingly attenuated and remote.” Artiglio, 957 P.2d at 1320. Second, Dow Corning also performed its own product safety testing, specifically on breast implants, from the early 1960s onward. By contrast, Dow Chemical never tested silicone gel breast implants. In addition, Dow Corning relied upon safety testing by Dr. Cronin in the early 1960s before marketing its breast implants. Third, the Mahlums contend that Dow Corning was aware of possible biological effects and migration of silicone fluids from late 1960s onwards; if true, then Dow Corning could not have been relying upon Dow Chemical to ensure the safety of silicone gel breast implants.

CONCLUSION

Finally, the majority holding with regard to the claim of negligent undertaking will have far-reaching implications on our jurisprudence. As mentioned above, Dow Chemical and Corning Incorporated created Dow Corning as a separate entity under corporate legal principles. There is no suggestion that Dow Corning is or was underfunded or a product of fraud or abuse. Indeed, the Mahlums explicitly abandoned their alter ego theories in this case. Yet the Mahlums and this court seek to make Dow Chemical responsible for Dow Coming’s alleged product failures.[11]
Additionally, in performing tests and advising on how other tests should be performed, Dow Chemical often served in the role of consultant. It is also in that role of consultant that the Mahlums and this court seek to render Dow Chemical liable in tort for allegedly undertaking responsibilities that were properly Dow Coming’s. The majority now states, in effect, that it will hereafter require companies (i.e. consultants) to publish unfavorable test results that they have done for their clients. This duty will also require an attendant duty of consultants to monitor their client’s new products, to determine whether their research is implicated in those products. Neither the law nor public policy justifies such a result.
The Mahlums thus lacked evidence to establish that Dow Chemical ever undertook a duty to test the safety of the silicone fluid used in Dow Coming’s breast implants or undertook a duty *1537 to test and guarantee the safety of the breast implants themselves. The jury’s verdict on the Mahlums’ claim of negligent performance of an undertaking should not stand. I therefore dissent from the affirmance of the claim of negligent undertaking, and would reverse the judgment in its entirety.

I would also decline to follow, as the Mahlums urge, the federal district court decision in In re Silicone Gel Breast Implants Prods. Liab. Litig., 887 F. Supp. 1455 (N.D. Ala. 1995) (“In re Silicone Gel”) (holding that the foreseeability of harm to third persons alone may be sufficient to create a duty to the third persons). A basic tenet of tort negligence law is that foreseeability, while a predicate of negligence liability, is insufficient by itself to establish duty. Ashwood, 113 Nev. at 85, 930 P.2d at 743; see also In re New York State Silicone Breast Implant Litig., 642 N.Y.S.2d 681 (App. Div. 1996) (“In re N.Y. State Silicone”) (refusing to follow In re Silicone Gel); TMJ Implants, 113 F.3d 1484 (8th Cir. 1997) (same).

 The trademark agreement is addressed below.

I note that Wright also undercuts the emphasis that the majority places on Dr. Rowe’s role as a consultant to Dow Corning. This court specifically noted in that case “that the mere advice or warning by one person to another that care should be taken to avoid a certain risk does not in itself create an undertaking and consequent liability on the part of one giving such advice.” Wright, 105 Nev. at 614, 781 P.2d at 1145.

The Mahlums and the majority observe that one Dow Corning employee testified that “every new organosilicon” from Dow Corning was sent to Dow *1530 Chemical for testing. The same testimony went on to qualify, however, that the procedure was to evaluate the silicones “for [their] potential hazards just in material handling. That was simply a safety procedure.”

The Mahlums argue that, according to Restatement section 324A, “any undertaking to render services to another” can impose liability on a defendant. See section 324A, cmt. b. Comment b, however, is entirely consistent with the clarification of section 324A given by the courts, namely that the scope of the undertaking logically limits the scope of liability to follow. Thus, the scope of the undertaking regarding toxicological tests for industrial handling purposes limits Dow Chemical’s potential liability exposure to industrial injuries. Dow Chemical’s possible liability based on other testing is discussed in the text above.

It is undisputed that there exist thousands of different organosilicon compounds and that different formulations of these compounds possess different properties, i.e., organosilicons are not fungible chemicals. Further, silicones (a shorthand way of referring to organosilicons) come in various forms: compounds, resins, fluids, and hard, rubber-like substances. The particular form silicone may take matters, and the testing results of one type of form, such as the rubber form, do not automatically apply to another form, such as the fluid.

For example, immediately after stating that silicones as a group pose minor hazards, the article states that “[t]he volatile hexamethyldisiloxane is a good solvent, and as with any good organic solvent, repeated and prolonged skin contact should be avoided. The material is immediately painful to the eyes but causes no corneal damage.” Dr. Rowe testified in this case that at the time he did not know that silicones were to be used in medical devices. He also observed that the article merely states that the materials studied under the specific set of circumstances described in the article showed no adverse toxicological effects; he believed that such results would hold true even today.

Dr. Chenoweth’s signature is missing from the copy of the report signed by the other two authors, Dow Corning scientists.

The 1957 Miami study tested DC 200, an industrial grade of the DC 360 medical grade fluid used in Silastic II breast implants. DC 360 was not utilized in Dow Coming’s breast implants until 1975 — when Silastic I was first marketed. Prior to 1975, it appears that another Dow Corning silicone fluid, DC 330, was used in its breast implants.

 I do not mean to criticize the Mahlums for their attempts to adapt tort liability concepts to this problem. The untimely departure of Dow Corning from this litigation made the Mahlums’ task in establishing liability most difficult indeed.