Argued and submitted January 28, affirmed July 1, 2009

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## DAVID DEAN KILLION,
*Defendant-Appellant.*

Clatsop County Circuit Court
057354; A135719

211 P3d 367

Kevin T. Lafky argued the cause and filed the brief for appellant.

Susan G. Howe, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

SCHUMAN, J.

**SCHUMAN, J.**

Defendant was convicted of driving under the influence of intoxicants (DUII) and resisting arrest. On appeal, he assigns error to the trial court's failure to suppress evidence obtained through two allegedly unlawful stops, arguing that the evidence derived from a violation of his right under Article I, section 9, of the Oregon Constitution[1] to be free from unreasonable searches and seizures.[2] The state, in response, argues that defendant's encounter with a Department of Fish and Wildlife (ODFW) biologist did not constitute a seizure for purposes of Article I, section 9, and that the subsequent stop by a Clatsop County Sheriff's Department deputy was justified by reasonable suspicion. For the reasons that follow, we agree with the state, and we therefore affirm.

The following facts are either undisputed or taken from the trial court's findings and supported by constitutionally sufficient evidence. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). In November 2005, ODFW biologist Troy Laws was gathering elk harvest information and other biological data on property owned by Weyerhaeuser but opened by the company to the public. His practice was to contact hunters and inquire about their hunting and any animals killed. Laws wore an ODFW uniform, including an ODFW patch on his left shoulder and a hat with a similar insignia, and drove a white pickup truck that was unmarked but displayed a public "E license plate." Laws testified that he could ask hunters for proof that they possessed current hunting licenses and tags[3] but had no authority to arrest a hunter or confiscate animals killed illegally. He also testified that he

---

[1] Article I, section 9, of the Oregon Constitution provides, in part:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

[2] Defendant also argues that the trial court's ruling violated his rights under the Fourth Amendment to the United States Constitution. His argument, however, fails to present any "thorough and focused constitutional analysis." *See State v. Thompson*, 328 Or 248, 254 n 3, 971 P2d 879, *cert den*, 527 US 1042 (1999) (refusing to address constitutional claims in the absence of such an analysis). Accordingly, we decline to address his federal claim.

[3] ORS 497.036(1) provides that "[t]he holder of any license, tag or permit to * * * hunt or trap must consent to the inspection of any such license * * * [b]y any employee of the State Fish and Wildlife Commission or any person authorized to enforce the wildlife laws."

had received training by the Oregon State Police to help him recognize whether a person was under the influence of intoxicants but that he had no specific obligation to report intoxicated drivers to the police.

Laws, seeing defendant driving toward him on a narrow, one-lane road, pulled to the side of the road to let defendant pass and "just waved at him to stop and talk to him to see if he was successful or if he was hunting or doing whatever." Defendant stopped; both Laws and defendant remained in their vehicles and spoke to each other through open windows. Laws noticed a rifle in defendant's vehicle and asked him "how the hunting was going." At that point, Laws testified,

> "I was kind of concerned because [defendant] was falling over onto the steering wheel, glassy-eyed, and just—I was only about six feet apart, and I could smell alcohol.
>
> "* * * * *
>
> "When he was falling over on the steering wheel while we were talking, it was just that—he did probably four or five times—I don't know if he could stand up if he got out of the car. * * *"

Laws testified that his contact with defendant ended because defendant "got a phone call—cell phone call. And I needed to move on and check other people. I mean, check for other game and so forth."

Laws believed that defendant was under the influence of intoxicants and called a Weyerhaueser security officer, who told him that Weyerhaeuser had no policies concerning intoxicated drivers and that he should contact the Oregon State Police. Laws did so, but because there were no officers nearby, the police dispatcher referred him to the Clatsop County Sheriff's Department. Laws gave the Sheriff's Department his full name, stated that defendant was driving "a green Chevy, and the plate was similar to KCP176," and described defendant's impaired state.

Deputy Sheriff Phillips received a dispatch from the sheriff's department and reached the road where defendant was driving approximately one-half hour later. Phillips and defendant drove past each other. Phillips observed only the

three numbers on defendant's license plate. Because those numbers matched the description that he had received from dispatch, Phillips turned around and followed defendant from a distance of "several hundred feet"; Phillips did not activate his lights or siren. Defendant stopped his truck in a gravel area to the side of the road, and Phillips stopped his car about one car length in front of defendant's truck. Phillips then saw that the license plate on defendant's truck differed by one letter from Laws's description—defendant's license plate read WCP176[4]—and that defendant drove "a green Ford instead of a green Chevy, so—well, I was reasonably sure that that was the vehicle." Phillips testified that his intention in contacting defendant was "[j]ust to see if—you know—he really was intoxicated, that the—that the reporting party was correct."

Phillips approached the driver's side door of defendant's vehicle and signaled with his finger for defendant to roll down the window. Defendant shook his head no. At that point, Phillips testified, defendant's "facial expression, the blank stare, slouching—those were all things that were confirming my suspicions that he was under the influence." Phillips again signaled with his finger for defendant to roll down his window. Instead, defendant opened his door about ten inches. Defendant testified as follows:

"[Defendant's Counsel]:   Did you then believe, after he made the second signal, that you were required to either talk to or have contact with him?

"[Defendant]:   Yes.

"[Defendant's Counsel]:   Did you then open your door in direct response to his second signal to roll down your window?

"[Defendant]:   Yes."

_____

[4] Phillips testified that Laws reported the license plate as KCP176 and that it actually read WCP176, but the trial court's findings state that Laws reported the plate as WCC176 and that it actually read KCC176. In each version, defendant's license plate differs by one letter from Laws's description. That discrepancy is therefore irrelevant to our analysis.

Phillips testified that defendant was "visibly impaired"; Phillips could smell a strong odor of alcohol coming from defendant, and defendant "had watery, bloodshot eyes[,] * * * a thick tongue, slow, slurred speech." Phillips asked defendant for his driver's license. Defendant responded that he did not have one. Defendant attempted to close his car door, but Phillips used his leg to prevent defendant from doing so because he did not want defendant to lock himself in the car with a rifle. Phillips asked defendant to perform field sobriety tests; defendant refused and again attempted to close the door, but Phillips leaned into it with his shoulder, again preventing him from closing it. A struggle ensued, after which Phillips arrested defendant.

Defendant was charged with DUII, ORS 813.010, and resisting arrest, ORS 162.315. The trial court denied defendant's motion to suppress evidence obtained through what defendant alleged were unlawful stops by Laws and Phillips. The court concluded, in part, as follows:

"1. The contact with defendant initiated by Laws was an encounter and not a stop. Reasonable suspicion by Laws was not required.

"2. The stop of defendant by Deputy Phillips occurred when Phillips blocked defendant's attempt to close the pickup door. When Phillips approached the parked pickup, possessing the information supplied by Laws, he had a reasonable * * * suspicion that [defendant] had committed the offense of DUII."

The court entered a judgment of conviction against defendant.

On appeal, defendant assigns error, first, to the trial court's denial of his motion to suppress evidence obtained through what he argues was an unlawful stop by Laws. Defendant argues that Laws's actions constituted a "seizure" of defendant for purposes of Article I, section 9, and that that seizure violated defendant's rights because Laws did not have reasonable suspicion to stop him. The state, in response, argues that Laws's actions did not constitute a seizure because they did not significantly restrict defendant's liberty. We review the trial court's denial of defendant's pretrial motion to suppress for errors of law. *State v. Hall*, 339 Or 7,

10, 115 P3d 908 (2005). For the reasons that follow, we agree with the state that Laws's actions did not constitute a seizure for purposes of Article I, section 9.

Not every encounter between citizens and state actors—usually, but not always, law enforcement officers[5]—constitutes a "seizure" of the citizen for purposes of Article I, section 9. In *State v. Holmes*, 311 Or 400, 407, 813 P2d 28 (1991), the Supreme Court explained:

> "First, a police-citizen encounter without any restraint of liberty (*e.g.*, mere conversation, a non-coercive encounter) is not a 'seizure' and, therefore, requires no justification. Second, a 'seizure' of a person occurs when a police officer temporarily restrains a person's liberty (a 'stop' under ORS 131.605(5)) justified by reasonable suspicion of the citizen's criminal activity. Third, a 'seizure' of a person occurs upon an arrest, justified by probable cause to believe that the person arrested has committed a crime."

(Citations and footnotes omitted.) Under the second category, the court held, a person is "seized," and therefore stopped,

> "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances."

*Id.* at 409-10 (footnote omitted).

In deciding whether police conduct constitutes a "seizure" for purposes of the second category, the *Holmes* court held that "[t]he pivotal factor is whether the officer, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner that would be perceived as a nonoffensive contact if it had occurred between

---

[5] Article I, section 9, prohibits state action that infringes on a citizen's constitutional rights; it therefore protects against unlawful seizures by state actors, not only law enforcement officers. *See, e.g., State v. Tucker*, 330 Or 85, 997 P2d 182 (2000) (a tow truck driver acting under the direction of the police); *State v. Okeke*, 304 Or 367, 745 P2d 418 (1987) (an employee of a state-funded detoxification center); *State v. Scatchard*, 208 Or App 315, 145 P3d 237, *rev den*, 342 Or 254 (2006) (a volunteer firefighter). In the present case, Laws encountered defendant while working as an ODFW employee. He was therefore a state actor for purposes of Article I, section 9.

two ordinary citizens." *Id.* at 410. This is "a fact-specific inquiry into the totality of the circumstances of the particular case." *Id.* at 408. In *Holmes*, for example, a police officer flagged down a driver in order to divert him around a detour, then, after the driver rolled down his window, detected signs of intoxication. *Id.* at 402. The Supreme Court held that the encounter was not a stop.

> "Seeing an officer directing or stopping traffic because of a motor vehicle accident is a common experience. No psychologically intimidating environment had been created. * * *
>
> "A reasonable motorist in the circumstances of this case would believe that the stopping of defendant in his vehicle was nothing more than a brief encounter resulting in an insignificant intrusion."

*Id.* at 411. In *State v. Hall*, 339 Or at 19, an officer's actions of stopping his vehicle next to the defendant, who was on foot, "and then gesturing for [the] defendant to approach him did not intrude upon [the] defendant's liberty of movement, because, even if [the officer] inconvenienced [the] defendant, his actions did not constitute a show of authority involving conduct 'significantly beyond that accepted in ordinary social intercourse.'" (Quoting *Holmes*, 311 Or at 410.) The officer, therefore, did not "seize" the defendant for purposes of Article I, section 9, until he took the defendant's identification card and checked for outstanding warrants; at that point, "the consensual nature of that encounter dissipated, and the encounter evolved from a 'mere conversation' encounter into a restraint upon [the] defendant's liberty of movement." *Hall*, 339 Or at 19.

■ In the present case, Laws pulled to the side of the narrow, one-lane road and "waved at [defendant]." Like the gesture in *Hall*, that gesture "did not constitute a show of authority involving conduct 'significantly beyond that accepted in ordinary social intercourse.'" *Id.* (quoting *Holmes*, 311 Or at 410). Instead, that gesture and the subsequent interaction constituted "mere conversation, a non-coercive encounter." *Holmes*, 311 Or at 407. Indeed, it is clear from the testimony that defendant did not believe his liberty to have been significantly constrained; Laws testified that his contact with defendant ended when defendant "got a phone

call—cell phone call. And I needed to move on and check other people. I mean, check for other game and so forth." Given that defendant ended the encounter by taking a phone call, we cannot conclude that Laws interfered with his liberty or freedom of movement or that defendant reasonably believed that he did so. We conclude that Laws did not seize defendant within the meaning of Article I, section 9.[6]

Second, defendant assigns error to the trial court's denial of his motion to suppress evidence obtained through what he alleges was an unlawful seizure by Phillips. Defendant argues that Phillips seized him for purposes of Article I, section 9, the first time that he signaled for defendant to roll down his window, or, in the alternative, the second time that he did so, and that Phillips did not have reasonable suspicion to stop defendant at either time. The state, in response, argues that Phillips's actions did not constitute a seizure for purpose of Article I, section 9, until he prevented defendant from closing his car door and that Phillips had reasonable suspicion at that time. For the reasons that follow, we conclude that, regardless of when Phillips stopped defendant, he had reasonable suspicion based on the information that he obtained from Laws.

■■ When reasonable suspicion is based solely on an informant's report, that report must include sufficient indicia of reliability. *State v. Bybee*, 131 Or App 492, 495, 884 P2d 906 (1994). Specifically, three factors are important to determining the reliability of that report:

> "One is whether the informant is exposed to possible criminal and civil prosecution if the report is false. That factor is satisfied if the informant gives his or her name to law enforcement authorities * * *. The second factor is whether the report is based on the personal observations of the informant. * * * The final factor is whether the officer's own observations corroborated the informant's information. The officer may corroborate the tip either by observing the illegal activity or by finding the person, the vehicle and the location substantially as described by the informant."

---

[6] The state argued at trial that the encounter between Laws and defendant, even if it was a stop, was nonetheless lawful because it occurred pursuant to regulatory authority granted by the legislature. However, the state does not pursue this argument on appeal, and we therefore do not address it.

*Id.* (citations omitted); *accord State v. Hames*, 223 Or App 624, 629, 196 P3d 88 (2008). Ultimately, however, whether the report is reliable "rests on the particular circumstances in each case, because informant tips vary greatly in their value and reliability." *State v. Vanness*, 99 Or App 120, 123, 781 P2d 391 (1989).

■ In the present case, we conclude that Laws's report was reliable. He provided his name to the Sheriff's Department, his report was based on his personal observations, and Phillips corroborated the report by "finding the person, the vehicle and the location substantially as described" by Laws. *Bybee*, 131 Or App at 495. Defendant disagrees, arguing that Laws was not exposed to criminal or civil prosecution because he could claim immunity by virtue of his position as an ODFW employee and that the report was not specific enough for Phillips to accurately identify defendant's vehicle because Laws reported an incorrect license plate number and an incorrect make and model. The factors described above, however, are not necessarily determinative; rather, they are intended to help evaluate the reliability of a report. In the present case, Laws had no motivation to falsify his report, and even if we were to accept the argument that he was immune from prosecution, we can presume that he would have suffered some adverse employment consequences had he been found to have provided false information. Further, we have previously concluded that a license plate identification that is incorrect by one letter is sufficient to identify a vehicle, *Bybee*, 131 Or App at 494-96, and, given the circumstances of this case, an incorrect identification of the vehicle's make and model similarly do not invalidate the report. Laws's report was reliable and gave Phillips reasonable suspicion to stop defendant.

Affirmed.