Argued and submitted May 31, 2019, reversed and remanded January 27, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

AHMED ALMAHMOOD,
*Defendant-Appellant.*

Washington County Circuit Court
17CR20550; A166206

482 P3d 88

Police officers removed defendant from a TriMet train after he failed to show valid proof that he had paid his fare. After a records check revealed that defendant had been banned from riding TriMet trains, officers arrested him and found brass knuckles during a search incident to arrest. Defendant was charged with weapons crimes and theft of services. Before trial, defendant filed a motion to suppress, arguing that officers had unlawfully seized him when they ordered him to show proof that he had paid his fare and asserting that evidence found as a result of the fare check should not be admitted at trial. The trial court denied the motion and convicted defendant of the charged crimes following a bench trial. On appeal, defendant challenges the trial court's denial of his motion to suppress. *Held*: The officers seized defendant when they ordered him to show proof of fare payment, and, in this case, the state did not meet its burden of establishing that the seizure was reasonable for the purposes of Article I, section 9, of the Oregon Constitution. The trial court therefore erred when it denied defendant's suppression motion. That error was not harmless.

Reversed and remanded.

Beth L. Roberts, Judge.

Sarah De La Cruz, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

David B. Thompson, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Anna M. Joyce and Markowitz Herbold PC filed the brief *amicus curiae* for Tri-County Metropolitan Transportation District.

Before Tookey, Presiding Judge, and Shorr, Judge, and Hadlock, Judge pro tempore.*

HADLOCK, J. pro tempore.

Reversed and remanded.

_____

* Hadlock, J. pro tempore, *vice* Armstrong, P. J.

## HADLOCK, J. pro tempore

Police officers removed defendant from a TriMet train after he failed to show valid proof that he had paid his fare. After a records check revealed that defendant had been banned from riding TriMet trains, officers arrested him and found brass knuckles during a search incident to arrest. Defendant was charged with felon in possession of a restricted weapon, carrying a concealed weapon, and theft of services. Before trial, defendant filed a motion to suppress, arguing that officers had unlawfully seized him when they ordered him to show proof that he had paid his fare and asserting that evidence found as a result of the fare check should not be admitted at trial. The trial court denied the motion, and it convicted defendant of the charged crimes following a bench trial. On appeal, defendant challenges the trial court's denial of his motion to suppress. As explained below, we conclude that the officers seized defendant when they ordered him to show proof of fare payment. We also hold that, in this case, the state did not meet its burden of establishing that the seizure was reasonable for purposes of Article I, section 9, of the Oregon Constitution. The trial court therefore erred when it denied defendant's suppression motion. That error was not harmless. Accordingly, we reverse and remand.

For purposes of this appeal, the facts are not in dispute. At the suppression hearing, Tualatin police officer Radakovich described the events leading up to his presence on the TriMet train, defendant's arrest, and the associated search. Radakovich explained that TriMet contracts with local police agencies "to help enforce the laws and safety and security of the TriMet lines." On the day in question, Radakovich was "contracted from Tualatin to TriMet" and, in conjunction with that assignment, boarded a TriMet train along with three other officers, who "spread out throughout the train." The officers were "trying to make more of a visual presence and at the same time checking fares."[1]

---

[1] Although the record does not include direct evidence that the police officers were in uniform when they boarded the train, Radakovich's reference to a "visual presence" suggests as much, and defendant asserted in the trial court without contradiction that the officers were uniformed. Our analysis, like the parties' arguments, therefore assumes that the officers were readily identifiable as police officers when they conducted the fare check.

The officers loudly announced that they were "doing a fare check," and they told passengers to display proof of the fares they had paid. Radakovich then checked passengers' fares "row by row." Another officer asked defendant for proof of payment. Defendant displayed a picture on a phone, but it was not valid proof that he had paid his fare. Defendant was arrested, and officers found brass knuckles on defendant's person during a search incident to arrest.

Radakovich later testified at the suppression hearing that officers removed people from the train if—like defendant—they did not show valid proof of payment and that officers "detained [those people] until we figured out what was going on." Radakovich acknowledged that defendant did not have the option of declining to show the officers proof that he had paid his fare.

After being charged with the crimes listed above, defendant filed a suppression motion in which he argued that officers had seized him, for purposes of Article I, section 9, when they required him to show proof of fare payment. Defendant further argued that the seizure was unconstitutional because it was not justified by reasonable suspicion that he was committing a crime. Defendant acknowledged that TriMet "has the right to ensure that only paying passengers board their trains and buses," and he conceded that TriMet "employees or other agents" may conduct fare checks without violating passengers' constitutional rights. But when TriMet uses police officers to check fares, defendant argued, "constitutional protections attach to those interactions *** with the passengers of those trains." In response, the state argued that it did not matter, for constitutional purposes, that police officers—not TriMet employees—were checking passengers' fares. The state also argued that, even if an Article I, section 9, seizure had occurred, it was a permissible administrative stop. The trial court denied defendant's suppression motion, apparently on the basis that the officers' fare check had not constituted a seizure of defendant.[2]

---

[2]  Specifically, the court ruled that "defendant voluntarily entered onto TriMet property" and that "a reasonable person could expect a fare check on the TriMet line and I do not find that the [officers'] conduct was significant interference."

On appeal, defendant reiterates his argument that the officers' fare check was a seizure that violated Article I, section 9, because it was not supported by reasonable suspicion. Defendant appears to again acknowledge that other TriMet employees may perform fare checks without implicating Article I, section 9, but he argues that police officers' involvement had constitutional significance because it "amount[ed] to a show of authority that restrained defendant's liberty."[3] Defendant asserts that the officers' command to show proof of fare payment "required defendant to produce evidence that he was not violating the law," that the officers were thus conducting a criminal investigation, and that the command therefore significantly interfered with defendant's liberty because he would not have felt free to terminate his encounter with the officers. Defendant also contends that the state did not prove either that the seizure was justified by reasonable suspicion that defendant was engaged in criminal conduct or that the seizure was a constitutionally permissible administrative stop. On the latter point, defendant asserts that "the state did not establish that a valid administrative policy would have authorized a fare check" because the state failed to offer evidence of Trimet's administrative code prior to the close of evidence, the trial court denied the state's request that it take judicial notice of the administrative code, "and there was no evidence of whether the officers followed such a policy."

In response, the state first argues that the officers did not seize defendant when they required passengers, including defendant, to show proof of fare payment. The state asserts that the record does not support defendant's contention that the officers were conducting a criminal investigation. To the contrary, the state argues, "the evidence established that, when the officers made the fare

---

[3] Although most search-and-seizure cases involve police officers' actions and therefore are often framed in terms of the permissibility of officers' conduct, Article I, section 9, "protects against unlawful seizures by state actors, not only law enforcement officers." *State v. Killion*, 229 Or App 347, 353 n 5, 211 P3d 367, *rev den*, 347 Or 349 (2009). Thus, in some circumstances, action by a government official may be sufficiently coercive to constitute a seizure even though that official is not a law enforcement officer. In this case, however, defendant's argument that the officers' "proof of fare" command constituted a stop depends on their status and presence as law enforcement officers.

check announcement and then checked for proof of fare, they were acting pursuant to their 'duties as a TriMet officer' to 'enforce the laws and rules of TriMet.'" And, even if the officers had been engaged in a criminal investigation, the state asserts, nothing in the record establishes that the passengers would have perceived that. In the end, the state contends that the circumstances did not amount to a seizure, even if something about the officers' fare check may have suggested the possibility that officers were investigating suspected criminal activity. In the alternative, the state argues that any seizure was justified as an administrative stop.

TriMet also has submitted a brief in this case, appearing as *amicus curiae*. In supporting the state's argument that the officers' fare check was not a seizure, TriMet emphasizes that, "[a]s long as public transportation has existed, so has the concomitant ability of fare inspectors to request proof of payment." TriMet describes a long history of train passengers being required to pay fares and to be able to prove that they have done so. It contends that fare checks on public transportation are such customary and ordinary occurrences that they do not implicate Article I, section 9, even when conducted by a police officer, unless the officer engages in coercive, threatening, or overbearing conduct. For similar reasons, TriMet asserts that, even if the officers' fare check amounted to a seizure, that seizure was reasonable for purposes of Article I, section 9.

The parties' arguments are based on fundamental principles of search-and-seizure law. Article I, section 9, guarantees the right of the people to be free from "unreasonable" searches and seizures. "For purposes of Article I, section 9, a seizure occurs when (1) a police officer intentionally and significantly interferes with an individual's liberty or freedom of movement; or (2) a reasonable person, under the totality of the circumstances, would believe that his or her liberty or freedom of movement has been significantly restricted." *State v. Arreola-Botello*, 365 Or 695, 701, 451 P3d 939 (2019). Because "encounters between law enforcement officers and citizens are of an infinite variety," the analysis of whether a particular encounter was a seizure for purposes of Article I, section 9, is a "fact-specific" inquiry

that "requires an examination of the totality of the circumstances involved." *State v. Backstrand*, 354 Or 392, 398-99, 313 P3d 1084 (2013) (internal quotation marks omitted). When "a police officer conducts a * * * seizure without a warrant, the state [has] the burden to establish the lawfulness of the officer's conduct," that is, that some exception to the warrant requirement applied. *State v. Ruiz-Espinosa*, 307 Or App 743, 747, 477 P3d 1233 (2020).

In determining whether a particular encounter was a seizure, we keep in mind that "the constitutional concern is with police-imposed restraints on citizen liberty, not with limiting contacts between police and citizens." *Backstrand*, 354 Or at 400. Thus, Article I, section 9, does not limit a police officer's authority to approach an individual and request information or cooperation, so long as the officer's conduct would not "be reasonably perceived as coercive in the sense that it would cause [that individual] to reasonably believe that the officer is intentionally restraining the [individual's] liberty or freedom of movement in a significant way—that is, in a way that exceeds the bounds of ordinary social encounters between private citizens." *Id.*

As applied to this case, those principles require us to consider whether a reasonable person in defendant's position—a passenger on a TriMet train—would have believed that police officers were significantly restricting his liberty when they required him to show proof that he had paid his fare. In addressing analogous questions in other cases, we and the Supreme Court have identified certain circumstances that tend to show that an encounter was a seizure, one of which includes an expectation that involuntary detention would follow a person's refusal to cooperate with officers. For example, an officer's request for identification—standing alone, an act that is not a seizure[4]—may constitute a seizure if made in circumstances that would suggest to reasonable people that they would be detained if they "either would not, or could not, produce identification." *State v. Zamora-Martinez*, 264 Or App 50, 56, 331 P3d 1023 (2014). Similarly, a conversation between an officer and an individual that would not otherwise constitute a stop may become

---

[4] *State v. Bese*, 295 Or App 254, 259, 433 P3d 766 (2018).

one if the officer directly and unambiguously communicates "that he or she is conducting an investigation" that could result in the individual's arrest or citation. *State v. Jackson*, 268 Or App 139, 145, 149, 342 P3d 119 (2014). *See also State v. Stevens*, 364 Or 91, 101-02, 430 P3d 1059 (2018) (police officer stopped an individual when he warned her that she could be in trouble with her parole officer if she was lying to the police officer); *State v. Paskar*, 271 Or App 826, 839, 352 P3d 1279 (2015) (trooper who commanded production of the defendant's halibut tag seized the defendant because the command "conveyed without ambiguity that defendant had to remain where he was while the troopers investigated him for a halibut-related crime").

Conversely, pertinent factors that can weigh against a determination that an encounter is a seizure include: that the officer interacted with a person for reasons not specific to that individual (*cf. State v. Holmes*, 311 Or 400, 411, 813 P2d 28 (1991) (no seizure where officer stopped drivers to inform them that, because of an accident, a road was closed and drivers needed to take alternative route, and "[t]he intrusion was tailored in direction and manner to be insignificantly intrusive")); that any show of authority by the officer was undertaken for reasons not directed at the defendant (*e.g.*, *State v. Kuehne*, 300 Or App 698, 704-05, 454 P3d 797 (2019), *rev den*, 366 Or 493 (2020) (officer's conversation with the defendant on a public roadway was not transformed into stop by fact that officer had activated lights on patrol car on a dark evening, where the car was far from defendant and on the opposite side of the road)); that an officer merely inquired about possible criminal activity without making an accusation (*see State v. Nelson*, 294 Or App 793, 797-99, 433 P3d 370 (2018) (distinguishing between accusations of criminal activity and inquiries about suspected criminal activity)); and that the tone of the officer's questions was nonconfrontational and non-threatening (*State v. Graves*, 278 Or App 126, 136, 373 P3d 1197, *rev den*, 360 Or 465 (2016); *State v. Radtke*, 272 Or App 702, 708-09, 358 P3d 1003 (2015)).

In the end, the "was it a seizure?" question often is framed in terms of whether a reasonable person in the

defendant's position would have felt free to leave or to otherwise terminate the encounter with officers. *E.g.*, *Backstrand*, 354 Or at 401 (a "show of authority" that constitutes a stop happens when an officer conveys, "[e]xplicitly or implicitly," that a person with whom the officer is dealing "is not free to terminate the encounter or otherwise go about his or her ordinary affairs"); *State v. Bese*, 295 Or App 254, 258-59, 433 P3d 766 (2018) ("[F]or a show of authority to be a seizure, an officer must explicitly or implicitly convey that the individual is not free to terminate the encounter."); *State v. Sherman*, 274 Or App 764, 772, 362 P3d 720 (2015) (seizure occurred where officer's show of authority would lead a reasonable person to believe that he "was not free to leave"). The overall context of an encounter "may convey to a citizen that she is not free to leave, even if the content or manner of the officer's questions alone does not." *State v. Brown*, 293 Or App 772, 779, 427 P3d 221 (2018).

Considering the totality of circumstances in this case, we conclude that a reasonable passenger in defendant's position would have believed that police officers were significantly restricting his liberty when they required him to show proof that he had paid his fare. True, the record contains no evidence that the officers expressly threatened to detain or arrest any passengers who did not comply. Nor did the officers single out defendant or take action suggesting that he, in particular, was the target of an investigation. And the officers may well have had motivations in addition to enforcing the criminal law when they ordered passengers to show proof of payment. Moreover, we agree with TriMet that it is a common experience—not something "that exceeds the bounds of ordinary social encounters between private citizens," *Backstrand*, 354 Or at 400—for an organization that has sold services to an individual to require that individual to show proof of purchase before (or while) taking advantage of those services.

Nonetheless, the combination of two facts (considered in conjunction with the totality of the circumstances) leads us to conclude that reasonable TriMet passengers would have concluded that officers conducting the fare check were significantly interfering with passengers' liberty.

First, the officers required each passenger to show proof of fare payment, that is, proof that the passenger was lawfully riding the train—as defendant puts it, the requirement was that he establish that he had not committed a crime (such as theft of services). Second, the individuals issuing that non-negotiable command were law enforcement officers, that is, people with obvious authority to arrest individuals who commit crimes. Passengers who are told that they must prove to a law enforcement officer that they are lawfully riding a train would not expect that they could refuse, and then perhaps simply leave the train at the next stop without being required to submit to the officer's authority. Rather, reasonable people would believe that they had no choice but to show proof of payment to the officer and—because it was a law-enforcement officer imposing that requirement—that they could be subject to detention, citation, or arrest if unable or unwilling to produce valid proof of payment.

For that reason, this case is not analogous to *Backstrand*, in which the Supreme Court held that a police officer did not seize a youthful-looking defendant, who was inside an "adult" store, when the officer asked the defendant how old he was, requested his identification, and verified the validity of his driver's license. 354 Or at 394, 413-14. Two factors were key to that holding. First, the court held that the officer's conduct was not beyond what is "accepted in ordinary social intercourse," because "a reasonable [youthful-looking] person engaged in an age-restricted activity would expect to be questioned about his or her age." *Id*. at 415. Second, the court observed that a reasonable person in that situation would not perceive a significant restraint on his or her liberty because, "at most, a person so questioned might reasonably expect to be told to leave if he or she either would not or could not produce valid identification sufficient to verify that he or she was not a minor." *Id*. at 414-15. That consequence—simply being told to leave a place where a person had no legal right to be—"would not be coercive for purposes of Article I, section 9." *Id*. at 415. Here, although the officer's conduct in requesting proof of fare payment falls within the bounds of what is accepted in analogous business circumstances, the reasonably expected consequence

of failure to comply is markedly different—potential detention, citation, or arrest, as opposed to simply being directed to leave a store.

This is a close case. We agree with the state and with TriMet that people who must pay a fare to ride public transportation should not be surprised to be asked to show proof of that payment. And—absent something more—it may well be that a provider of public-transportation services does not significantly interfere with individual passengers' liberty merely by requiring them to show proof of payment for that service. After all, a routine command that train passengers show proofs of fare does not target any specific individual, it does not itself detain passengers or otherwise interfere with their movements, it is not associated with investigation of other criminal activity, and it is not outside of common experience. But the question before us is whether a reasonable passenger would feel free to refuse a *police officer's* command to show proof of payment, without fear of involuntary detention or adverse legal consequence. Given the totality of the circumstances in this case, we conclude that a reasonable passenger would not feel free to do so. We therefore conclude that officers seized defendant when they ordered him to show proof that he had paid his fare to ride the train.

Determining that a police officer seized an individual ordinarily is only the first step of an Article I, section 9, analysis; the question remains whether the state has established that the seizure was reasonable, *i.e.*, justified for constitutional purposes. *See, e.g.*, *State v. Barber*, 279 Or App 84, 89, 379 P3d 651 (2016) ("It is the state's burden to prove that an exception to the warrant requirement justified a warrantless search or seizure."). In this case, however, the state understandably has not argued that the seizure was justified by either reasonable suspicion or probable cause of criminal activity, given that all passengers were required to show proof of fare payment, not just defendant. Nor has the state argued that the stop otherwise was "reasonable" for purposes of Article I, section 9, or that it fell within some other recognized exception to the warrant requirement (except to the extent it argues that any seizure was

a permissible "administrative stop," an argument that we briefly address below).

Amicus TriMet has staked out that position, essentially contending that the ordinariness of a "proof of fare" requirement means that the officers' fare-checking conduct in this case was reasonable for purposes of Article I, section 9, even if it constituted a seizure that was not justified by reasonable suspicion or probable cause. Indeed, the Supreme Court has recognized that, in certain specific contexts, some types of searches or seizures may be deemed reasonable even though they do not fit neatly into the long-established exceptions to the warrant requirement. E.g., State ex rel Juv. Dept. v. M. A. D., 348 Or 381, 389-91, 395, 233 P3d 437 (2010) (no Article I, section 9, violation where a school employee conducted a warrantless search by reaching into a student's pocket and removing contraband based on suspicion not rising to probable cause; concluding "that the school context is sufficiently different from the setting in which ordinary police-citizen interactions occur to justify an exception to the warrant requirement in certain circumstances"). However, the state has not made such an argument in this case (and, indeed, TriMet does not develop the argument beyond stating it), so we do not further address the possibility that—in this specific fare-check context—the seizure might be permissible under Article I, section 9, even though not justified by reasonable suspicion or probable cause of criminal activity. See State v. Bray, 363 Or 226, 245 n 15, 422 P3d 250 (2018) (declining to address arguments made by amici that the state had not made on review).

We also reject the state's contention that we can affirm the trial court's ruling on the alternative ground that any seizure was a valid administrative stop. A detailed discussion of that point would not benefit the bench, bar, or public. It is sufficient to note here that the state—the party with the burden to establish the constitutionality of a warrantless seizure—did not make a record in the trial court sufficient to establish all the requirements of an administrative stop, viz., that "it is conducted for a purpose other than law enforcement, pursuant to a policy that is authorized by a politically accountable lawmaking body, [and]

the policy eliminates the discretion of those responsible for conducting the search." *State v. B. A. H.*, 245 Or App 203, 206, 263 P3d 1046 (2011) (citations omitted). We express no opinion on whether, in another case, the state might be able to prove that a fare check conducted by police officers meets those requirements.

In sum, police officers seized defendant when they required that he produce proof that he had paid his train fare. The state has not established, in this case, that the seizure was "reasonable" for purposes of Article I, section 9. The trial court therefore erred when it denied defendant's suppression motion. Having reviewed the entire record, we conclude that the trial court's error in denying the suppression motion was not harmless. Accordingly, we reverse and remand for further proceedings.

Reversed and remanded.