Submitted January 30, 2020, resubmitted en banc February 11, reversed and remanded March 9, petition for review allowed July 28, 2022 (370 Or 197)
See later issue Oregon Reports

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

SAM SAMSON ALCARAZ,
aka Samuel S. Alcaraz,
*Defendant-Appellant.*

Jackson County Circuit Court
17CR69739; A167663

508 P3d 13

Defendant was fishing from a boat on a public lake—standing in a pile of fish and reeling one in on his line—when a uniformed sheriff's deputy in a marked patrol boat idled up, asked how the fishing was going, and asked defendant whether he had a fishing license. According to the deputy, defendant was not free to leave at that point, as defendant was statutorily required to comply with a fishing license inspection. Defendant answered that he did not have a fishing license. Defendant was convicted of the crime of angling while suspended, ORS 497.441, a Class A misdemeanor. On appeal, defendant assigns error to the denial of his motion to suppress, arguing that, when the deputy asked whether he had a fishing license, defendant was stopped under Article I, section 9, of the Oregon Constitution, without a warrant or reasonable suspicion of a crime. The state responds that defendant was not stopped, because he was free to motor away without answering the deputy's question. *Held*: The trial court erred in denying defendant's motion to suppress. A reasonable person in defendant's situation would have understood that he was not free to leave but, instead, was required to stay and answer the deputy's question. As such, under established constitutional principles, and consistent with *State v. Almahmood*, 308 Or App 795, 482 P3d 88 (2021), defendant was stopped. The Court of Appeals emphasized that the only issue properly before it was whether defendant was stopped, and it left open the possibility of future arguments in other cases such as an evidence-based argument under the administrative exception.

Reversed and remanded.

En Banc

Lisa C. Greif, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Mark Kimbrell, Deputy Public Defender, Office of Public Defense Services, filed the briefs for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Christopher Page, Assistant Attorney General, filed the briefs for respondent.

Before Lagesen, Chief Judge, and Ortega, Egan, Tookey, Shorr, James, Aoyagi, Powers, Mooney, Kamins, Pagán, and Hellman, Judges, and Armstrong, Senior Judge.

AOYAGI, J.

Reversed and remanded.

Aoyagi, J., filed the opinion of the court in which Lagesen, C. J., and Ortega, Egan, Tookey, Shorr, and Hellman, JJ., and Armstrong, S. J., joined.

James, J., concurred and filed an opinion.

Powers, J., dissented and filed an opinion in which Mooney, Kamins, and Pagán, JJ., joined.

## AOYAGI, J.

Defendant was fishing from a boat—standing in a pile of fish and reeling one in on his line—when Deputy Denton, a Jackson County Sheriff's Deputy in a marked patrol boat, idled up and asked how the fishing was going. Denton then asked defendant, "Do you have a fishing license?" and defendant responded, "Nope." Denton issued a citation to defendant, who was later convicted of one count of angling while suspended, ORS 497.441. On appeal, defendant assigns error to the denial of his motion to suppress evidence from his encounter with Denton. Specifically, defendant contends that, when Denton asked if he had a fishing license, he was unlawfully seized under Article I, section 9, of the Oregon Constitution, without a warrant or reasonable suspicion of a crime. The state argues that defendant was not seized, as he was free to leave without answering the question. Because this case is indistinguishable in principle from *State v. Almahmood*, 308 Or App 795, 482 P3d 88 (2021), and because the only issue properly before us is whether defendant was stopped, we agree with defendant that the trial court erred in denying his motion to suppress. Accordingly, we reverse and remand.

### FACTS

We review the denial of a motion to suppress for legal error. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). We are bound by the trial court's express and implied factual findings if they are supported by constitutionally sufficient evidence. *Id.*

Deputy Denton was on Emigrant Lake operating a patrol boat that was equipped with sirens and had "Sheriff's Office" written on it. Denton was wearing his full uniform and a firearm. A search-and-rescue volunteer was with him. There were not many boats on the water. As Denton was idling across the lake, he saw defendant fishing from a small boat. Defendant, then 81 years old, was alone. Denton observed defendant reel in a fish and unhook it.

Denton idled to approximately 10 feet from defendant's boat—"within a comfortable talking distance"—and saw defendant standing in a "pile of fish" on the floor of

his boat. In a "conversational tone," Denton asked, "How's the fishing?" Defendant said or indicated that it was good. Denton asked, "Do you have a license?" At that point, according to Denton, defendant was not free to leave, because he was required under ORS 497.075 to have a fishing license and required under ORS 497.036 to submit to a fishing license inspection. Defendant answered, "Nope." Denton was surprised by defendant's answer, as he had not suspected defendant of illegal activity. Denton asked defendant why he did not have a license, and defendant responded that it had been suspended. The interaction was "very casual." Denton issued a citation to defendant.[1]

Defendant was charged with angling with a suspended license, ORS 497.441, a Class A misdemeanor. Before trial, he moved to suppress his statements to Denton, as resulting from an unreasonable seizure under Article I, section 9. The trial court denied the motion, reasoning that defendant was not seized when Denton asked if he had a fishing license, because there was no coercion, intimidation, or show of force by Denton. The court further reasoned that there was no seizure because Denton "had a statutory right" under ORS 497.036 and ORS 497.075 to talk to defendant regarding whether he had a fishing license. In the court's view, the encounter became a stop only after defendant admitted to not having a license.

Defendant waived a jury trial and was tried to the court on stipulated facts. The court found defendant guilty and sentenced him to 18 months' probation. Defendant appeals, assigning error to the denial of his motion to suppress.

## ANALYSIS

The primary issue before us is whether defendant was seized for purposes of Article I, section 9, when Denton asked him if he had a fishing license. It is undisputed that Denton lacked reasonable suspicion of a crime at that point. The state's argument turns not on reasonable suspicion but

---

[1] The search and rescue volunteer may have held onto defendant's boat while Denton issued the citation. Otherwise, the volunteer did not participate in the encounter, and the parties do not discuss the volunteer.

on whether defendant was stopped at all. In the state's view, defendant was not stopped because, when Denton asked him if he had a fishing license, defendant could have said nothing, started up his boat, and motored away. In other words, the state maintains that a reasonable person in defendant's position would have believed that he was free to leave, even if defendant was not actually free to leave insofar as Denton did not consider him free to leave. Defendant disagrees, arguing that Denton's question was confrontational in context and was reasonably understood "as a command [to defendant] to stay and notify the deputy whether he was fishing illegally."

Article I, section 9, guarantees people's right to be free from unreasonable searches and seizures. "For purposes of Article I, section 9, a seizure occurs when (1) a police officer intentionally and significantly interferes with an individual's liberty or freedom of movement; or (2) a reasonable person, under the totality of the circumstances, would believe that his or her liberty or freedom of movement has been significantly restricted." *State v. Arreola-Botello*, 365 Or 695, 701, 451 P3d 939 (2019).

Interactions between law enforcement officers and citizens tend to fall into one of three categories: mere encounters (or mere conversation), which require no justification; temporary detentions for investigatory purposes, often termed "stops," which generally require reasonable suspicion; and arrests, which involve protracted custodial restraint and require probable cause. *State v. Fair*, 353 Or 588, 593, 302 P3d 417 (2013). The three categories "correlate the degree of intrusiveness on a citizen's liberty with the degree of justification required for the intrusion." *Id*. "Both stops and arrests are seizures for constitutional purposes, while less restrictive encounters are not." *Id*. at 593-94. Whether a seizure occurred "requires a fact-specific inquiry into the totality of the circumstances of the particular case." *State v. Graves*, 278 Or App 126, 132, 373 P3d 1197, *rev den*, 360 Or 465 (2016) (internal quotation marks omitted).

Ultimately, "[w]hat distinguishes a seizure (either a stop or an arrest) from a constitutionally insignificant

police-citizen encounter is the imposition, either by physical force or through some show of authority, of some restraint on the individual's liberty." *State v. Paskar*, 271 Or App 826, 833, 352 P3d 1279 (2015) (internal quotation marks omitted). Article I, section 9, is concerned "with police-imposed restraints on citizen liberty, not with limiting contacts between police and citizens." *State v. Backstrand*, 354 Or 392, 400, 313 P3d 1084 (2013).

Thus, "law enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful." *Id.* (internal quotation marks omitted). A seizure occurs, however, "if the officer's conduct would be reasonably perceived as coercive in the sense that it would cause the citizen to reasonably believe that the officer is intentionally restraining the citizen's liberty or freedom of movement in a significant way—that is, in a way that exceeds the bounds of ordinary social encounters between private citizens." *Id.* "Explicitly or implicitly, an officer must convey to the person with whom he is dealing, either by word, action, or both, that the person is not free to terminate the encounter or otherwise go about his or her ordinary affairs," for a seizure to occur. *Id.* at 401.

In *Almahmood*, 308 Or App at 797-98, we held that a passenger on a TriMet train was seized when uniformed police officers boarded the train, announced a fare check, told passengers to display proof of their paid fares, and began checking passengers' fares row by row. The defendant was arrested after showing invalid proof of fare. *Id.* at 798. We concluded that "a reasonable person in defendant's position—a passenger on a TriMet train—would have believed that police officers were significantly restricting his liberty when they required him to show proof that he had paid his fare." *Id.* at 801. We recognized that it is not uncommon for an entity that sells services to require proof of purchase to use those services. *Id.* at 803. Also, the officers did not expressly threaten to detain or arrest passengers without paid fares, did not single out the defendant as an investigatory target, and may have had motivations other

than criminal law enforcement. *Id*. Nonetheless, two facts in particular, considered in conjunction with the totality of circumstances, led us to conclude that the officers significantly interfered with the defendant's liberty: that the officers required each passenger to show proof of payment, *i.e.*, to show that he or she was lawfully riding the train and had not committed a crime such as theft of services; and that the individuals demanding proof of fare were law enforcement officers with "obvious authority to arrest individuals who commit crimes." *Id*. at 803-04.

Under the circumstances, reasonable passengers "would not expect that they could refuse and then perhaps simply leave the train at the next stop without being required to submit to the officer's authority." *Id*. at 804. "Rather, reasonable people would believe that they had no choice but to show proof of payment to an officer requesting payment and—because it was a law-enforcement officer imposing that requirement—that they could be subject to detention, citation, or arrest if unable or unwilling to produce valid proof of payment." *Id*. The police officers therefore "seized defendant when they required that he produce proof that he had paid his train fare." *Id*. at 807. Because the state bore the burden of proof to establish the reasonableness of a warrantless seizure, and because the state's only developed argument was that the defendant was not seized, we held that the trial court erred in denying the defendant's motion to suppress. *Id*. at 806-07.

This case is virtually identical in principle to *Almahmood*. Defendant was fishing on a public lake, an activity that requires a fishing license to be done lawfully, just as riding a TriMet train requires a paid fare to be done lawfully. Defendant was actively engaged in the act of fishing, like the defendant in *Almahmood* was actively engaged in the act of riding the train. Denton approached defendant and asked him if he had the required license, just as the officers in *Almahmood* approached the defendant and asked him for proof of fare.[2] Fishing without a valid license is a Class A

---

[2] Defendant contends that he was "singled out" by Denton, making an even stronger case for a stop than in *Almahmood*, where the police officers checked everyone's fares. In our view, defendant being "singled out" is not as significant here as it might be in other circumstances. It is true that there is no evidence that

misdemeanor if done intentionally, knowingly, recklessly, or with criminal negligence. ORS 497.075; ORS 496.992(1); ORS 496.992(17)(a); ORS 161.085(6).[3] Riding a TriMet train "with intent to avoid payment therefor" is a Class C misdemeanor, theft of services having a value less than $100. ORS 164.125(1)(a), (5)(a). Comparable to the police officers in *Almahmood*, Denton was a uniformed and armed sheriff's deputy with obvious authority to detain, cite, or arrest defendant if he lacked a valid license.

As the state points out, unlike the train in *Almahmood*, Denton's encounter with defendant "did not occur in a confined physical location." That point is well taken, but we are unpersuaded that it meaningfully affects the analysis on these facts. Certainly, we do not understand the state to be suggesting that the likelihood of a successful *escape* is relevant to whether defendant was stopped. As for more open surroundings potentially reducing the pressure to answer a law enforcement officer's question or making it easier for a citizen to voluntarily terminate an encounter, that might well be true in some circumstances but not here. Defendant was legally obliged to submit to a fishing license inspection under ORS 497.036, which precluded him from simply declining to answer and motoring away with his pile of fish. Indeed, Denton testified that, once he asked defendant whether he had a fishing license, defendant was not free to leave. What a reasonable person in defendant's position would have understood—that he could not leave—was entirely aligned with the reality of the situation—that he could not leave.

---

Denton contacted anyone other than defendant. But relatively few boats were on the water, and nothing Denton said or did suggested that he specifically suspected defendant of not having a fishing license, as opposed to approaching him simply because he was a person fishing.

  [3] Subject to exceptions, "no person shall angle for * * * any wildlife unless the person has in possession such valid licenses, tags and permits therefor as the State Fish and Wildlife Commission issues." ORS 497.075(1). "Except as otherwise provided by this section or other law, a violation of any provision of the wildlife laws, or any rule adopted pursuant to the wildlife laws, is a Class A misdemeanor if the offense is committed with a culpable mental state." ORS 496.992(1). As used in section ORS 496.992, "'[c]ulpable mental state' has the meaning given that term in ORS 161.085." ORS 496.992(17)(a). ORS 161.085(6) defines "culpable mental state" to mean "intentionally, knowingly, recklessly or with criminal negligence" as further defined in ORS 161.085(7) - (10).

Whereas the trial court viewed Denton's "statutory right" under ORS 497.036 and ORS 497.075 to talk to defendant regarding whether he had a fishing license as supporting the conclusion that there was no stop, we view it as having the opposite effect. Defendant's statutory obligation to submit to a fishing license inspection made it impossible for him to simply terminate the encounter and motor away. The obligation to comply is the "something more" that brings this case into the realm of a seizure. *See Backstrand*, 354 Or at 403 (requiring "something more than just asking a question, requesting information, or seeking an individual's cooperation" for an officer's conduct to rise to the level of a stop); *see also State v. Zamora-Martinez*, 264 Or App 50, 56, 331 P3d 1023 (2014) (although an officer's request for identification alone is typically not a seizure, it is a seizure in circumstances in which a reasonable person would expect to be detained if they could not or would not produce identification).

Given defendant's statutory obligation to comply with a fishing license inspection, the fact that Denton asked defendant whether he had a fishing license in a "conversational tone" and that the encounter was "very casual" does not affect the result. Regarding the phrasing of the question, we disagree with the state that Denton avoided stopping defendant by asking, "Do you have a fishing license?" instead of "May I see your fishing license?" or "Please show me your fishing license." The difference in phrasing has no practical import under these circumstances. Denton understood that he was invoking his legal authority to conduct a fishing license inspection, and a reasonable person in defendant's position would have understood the same. As for the politeness of the inquiry, Denton assumed that defendant had a license, and he knew that defendant had to answer, so there was no reason for aggression. The fact remains that defendant could not simply decline to answer and leave. The question was necessarily coercive because defendant *had* to answer it. *See Backstrand*, 354 Or at 401 ("Explicitly or implicitly, an officer must convey to the person with whom he is dealing, either by word, action, or both, that the person is not free to terminate the encounter or otherwise go about his or her ordinary affairs.").

A reasonable person in defendant's position—that is, a person actively fishing from a boat on a public lake, who is required to have a fishing license and submit to its inspection upon request—would not believe that, upon a sheriff's deputy asking him if he had a license, he could simply start up his boat and motor away without answering. To the contrary, a reasonable person would understand that he was required to stay put, answer the question, and prepare to show his license. When Denton asked defendant whether he had a license, defendant's options were to admit to a crime (the evidence of which was in plain view) or tell a pointless lie that would be revealed immediately by his inability to produce a license. Leaving without answering was not an option. Because defendant could not terminate the encounter until he satisfied Denton that he had a fishing license, defendant's liberty and freedom of movement were significantly restrained. That is, he was stopped.[4]

For the same reasons discussed in *Almahmood*, the present situation is distinguishable from that in *Backstrand*, 354 Or at 414-16, wherein the Supreme Court held that a police officer did not seize a youthful-looking male when he approached him and his girlfriend in an age-restricted store, asked for their identification to confirm that they were old enough to be in the store, and returned their identification upon confirming that they were. Significantly, there was no indication in *Backstrand* that the defendant would be committing a crime if he was underage; rather, the risk was to the store owner. *See id*. at 395 & n 1 ("It is a misdemeanor offense for the owner, operator, or manager of a business to permit minors, if not accompanied by a parent or lawful guardian, to enter or remain where obscene materials are displayed. ORS 167.080."). As such, whether it was the proprietor, a store employee, or a police officer who

---

[4] We note that our conclusion that defendant was stopped is consistent with the Supreme Court's recent decision in *State v. Reyes-Herrera*, 369 Or 54, 67-68, 500 P3d 1 (2021) ("Acting on no more than a hunch, [a police officer] approached defendant and subjected him to questioning that, we conclude, would cause reasonable people to believe that they must remain where they are and respond. Whether or not the questions that [the officer] asked defendant can be characterized as accusing him of committing a crime, the totality of the circumstances was such that reasonable people in defendant's position would have believed that their liberty was restricted.").

asked for proof of his age, at most, the *Backstrand* defendant "'might reasonably expect to be told to leave'" if he was unable or unwilling to produce it. *Almahmood*, 308 Or App at 804 (quoting *Backstrand*, 354 Or at 414-15). The prospect of being told to leave is a "markedly different" consequence from the "potential detention, citation, or arrest" that the *Almahmood* defendant could reasonably expect to face if he refused to cooperate and produce proof of fare, *id.* at 804-05, or that defendant in this case could reasonably expect to face if he refused to cooperate and satisfy the deputy that he had a fishing license.

Having determined that our decision in *Almahmood*—and the well-established Article I, section 9, principles on which it is founded—leads to the inexorable conclusion that defendant was stopped, we must consider what to do about *State v. Hammond*, 99 Or App 293, 781 P2d 1143 (1989), *rev den*, 309 Or 291 (1990). In *Hammond*, a police officer approached the defendant on a public boat ramp as the defendant was loading a boat onto a trailer, asked whether he had been fishing, and requested to see his fishing license. *Id.* at 295. The defendant provided a fishing license to the officer, who, suspecting that it was invalid, walked to his patrol car to run a check over the radio. *Id.* Subsequent interaction led to the defendant being convicted of driving while suspended, ORS 811.175. *Id.* at 295-96. With almost no discussion, we concluded that the defendant was not stopped when the officer asked to see his fishing license and walked away to check it, because, even if the officer retained the fishing license while running the check, the defendant could have simply driven away without the fishing license, thereby voluntarily terminating the encounter. *Id.* at 296-97 ("Unlike a driver's license, a person does not need a fishing license to drive away.").

In the 33 years since *Hammond* was decided, we have cited it only twice, summarily applying it in *State v. Lunow*, 114 Or App 239, 835 P2d 129, *rev den*, 309 Or 574 (1992), and distinguishing it in *State v. Bailey*, 143 Or App 285, 294, 924 P2d 833 (1996). Given the brevity of our opinion in *Hammond*, it is possible that something about the underlying facts or the parties' arguments that is not revealed in the opinion might distinguish it. On its face, however,

we must agree with defendant that *Hammond* "cannot be squared" with subsequent case law and is "no longer good law." *See State v. Civil*, 283 Or App 395, 417, 388 P3d 1185 (2017) (describing our "rigorous" standard for disavowing our own precedent); *see also Farmers Ins. Co. v. Mowry*, 350 Or 686, 693 n 3, 261 P3d 1 (2011) (considerations that may be relevant when asked to overrule precedent are the age of the precedent, the extent to which it has been relied on in other cases, and the degree of the error in the earlier case); *Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 54, 11 P3d 228 (2000) (in reconsidering a prior constitutional ruling, appellate courts are particularly open to arguments that present new information or that demonstrate the court's failure to follow its usual methodology in the prior opinion).

        Even in 1989, it seems unlikely that a reasonable person in the position of the *Hammond* defendant would have believed that he was free to drive away while the police officer inspected his fishing license and sought to determine whether it was valid. *See State v. Warner*, 284 Or 147, 161, 585 P2d 681 (1978) (recognizing the same three categories of police-citizen encounters as recognized currently, *i.e.*, mere conversations, stops, and arrests). In any event, a reasonable person in the position of defendant in the present case would not believe that he was free to leave without answering whether he had a fishing license. Defendant was stopped. To the extent that *Hammond* would dictate a different result, we disavow *Hammond*, which may reflect an out-of-date approach to Article I, section 9, or may simply have been wrong when decided.[5]

        Before proceeding to the next portion of our analysis, we pause to address the dissent, which takes the view that no stop occurred. We make four points in response to the dissent. First, and most fundamentally, nothing in our reasoning or disposition in any way rejects—or is even

_____

    [5] As our text discussion suggests, multiple aspects of *Hammond* make it appropriate for reconsideration and, ultimately, overruling. The legal issue is a significant one, involving constitutional rights and a common scenario. Despite that fact, *Hammond* contains almost no legal analysis. Moreover, the decision is 33 years old, yet we have relied on it only once, and we arguably strained to distinguish it a few years later in the only other case citing it. This is precisely the type of situation contemplated by *Civil*.

in the slightest tension with—existing Supreme Court case law regarding voluntary cooperation with police requests for information. *See State v. Holmes*, 311 Or 400, 410, 813 P2d 28 (1991) (recognizing that police officers are free to approach citizens "on the street or in public places, seek their cooperation or assistance, request or impart information, or question them," without the need for constitutional justification). Our entire point is that defendant's cooperation was not *voluntary* in this case, but rather was coerced by virtue of the fact that he was *required* to answer the deputy's question. This situation therefore falls squarely outside the voluntary-cooperation examples given in *Holmes* and reaffirmed in later cases. *See* 318 Or App at 198-99 (Powers, J., dissenting).[6] Consider an analogy. If a state statute required citizens to submit to a patdown at any time upon the request of a police officer, the state would be hard pressed to argue that people were "voluntarily" submitting to patdowns, eliminating the need to obtain a warrant or to establish reasonable suspicion or a warrant exception.

Our other points in response to the dissent may be made more concisely. One is that we do not view the brevity of defendant's and Denton's pre-stop interaction—which the dissent emphasizes—as particularly relevant in these circumstances. There are many situations in which a police-citizen encounter is a stop from the moment it begins or becomes one quickly thereafter. The fact that it was Denton's

---

[6] Regarding *State v. Gerrish*, 311 Or 506, 508-09, 815 P2d 1244 (1991), cited in the dissent, that case involved a police officer responding to the scene of an armed robbery at a resort and setting up a checkpoint at the resort's only vehicular exit to identify potential witnesses and potentially prevent an armed robber from leaving the resort. The court held that, under the circumstances, a driver going through the checkpoint was not seized, because the officer was engaged in the vehicular equivalent of tapping a person on the shoulder to get their attention. *Id.* at 513. The Supreme Court has since clarified that, "[t]ogether, *Holmes* and *Gerrish* stand for the limited proposition that a law enforcement officer constitutionally may halt and briefly detain a person passing through a public area as a means to engage the citizen long enough to impart information or seek the citizen's cooperation or assistance"; they do not stand "for the broad proposition that the protections of Article I, section 9, do not extend to persons that police stop and detain as potential witnesses." *Fair*, 353 Or at 598-99. It should also be remembered that driver checkpoints for law-enforcement purposes are generally prohibited under Article I, section 9, except within the administrative exception. *See Nelson v. Lane County*, 304 Or 97, 743 P2d 692 (1987); *State v. Boyanovsky*, 304 Or 131, 743 P2d 711 (1987); *State v. Anderson*, 304 Or 139, 743 P2d 715 (1987).

second question, rather than his first or tenth, that made this encounter a stop has little bearing on the analysis on these facts. Next, common sense belies the state's position, adopted by the dissent, that defendant should have felt free to motor away without answering the deputy's question.[7] Defendant was required to answer the question. Denton knew it, and, as a citizen expected to know the law, defendant knew it. Indeed, Denton expressly testified that defendant was *not* free to leave once he asked defendant whether he had a license, because defendant was required to answer. The idea that an objectively reasonable person in defendant's position would nonetheless believe—*incorrectly*—that he was free to leave is not grounded in reality or existing case law. Finally, the dissent points out that landowners are entitled to inspect the fishing licenses of people fishing on their property. *See id.* at 200-01. That is true. ORS 497.036. But "[i]t is axiomatic *** that Article I, section 9, applies only to government-conducted or -directed searches and seizures, not those of private citizens." *State v. Lien/Wilverding*, 364 Or 750, 767, 441 P3d 185 (2019).

We now return to the next step of our analysis. Having concluded that defendant was stopped, the only remaining question is whether any exception to the warrant requirement applies. Critically, the state bears the burden of proof to establish the reasonableness of a warrantless seizure. *State v. Barber*, 279 Or App 84, 89, 379 P3d 6561 (2016). Here, similarly to *Almahmood*, the state directed all of its arguments in the trial court and in its appellate answering brief to establishing that there was no seizure. Only recently, in supplemental briefing filed at our request after *Almahmood* was decided, has the state posited any

---

[7] We emphasize that the state's only argument is that no stop occurred in this case because defendant was free *to not answer the deputy's question and instead motor away*. As we have described, that argument fails under well-established constitutional principles. It is the state's job, not ours, to either find a viable legal path to continuing its current wildlife enforcement practices or adjust those practices to come within the administrative exception or the like. *See* 318 Or App at 201 (Powers, J., dissenting) ("[T]he approach by the majority opinion effectively will require law enforcement to always articulate a heightened level of suspicion before asking an individual if there is a proper license, tag, or permit."). In choosing to make wildlife violations a crime, and in choosing to use criminal law enforcement officers to enforce wildlife laws, the state chooses to subject itself to constitutional constraints.

alternative theory. The state now argues that, if defendant was stopped, it was a permissible "administrative search" that did not require a warrant or reasonable suspicion.

As recognized in *Nelson v. Lane County*, 304 Or 97, 104, 743 P2d 692 (1987):

> "[A]n administrative search conducted without individualized suspicion of wrongdoing could be valid if it were permitted by a source of authority, that is, a law or ordinance providing sufficient indications of the purposes and limits of executive authority, and if it were carried out pursuant to a properly authorized administrative program, designed and systematically administered to control the discretion of non-supervisory officers."

(Internal quotation marks omitted.)

Preventing prospective or ongoing violations of the law can be a legitimate administrative purpose. *Id*. However, "the purpose of the search and the consequences that flow from it are significant." *Id*. When a search is conducted for an administrative purpose, without individualized suspicion, "the intended consequences of noncompliance with whatever standards the inspection is meant to uphold" must be "noncriminal" for it to constitute a reasonable search under Article I, section 9. *Id*. If offenders face criminal sanctions, the inspection implicates criminal law enforcement purposes and is not administrative in nature. *Id*. at 104-05; *see also State v. Anderson*, 304 Or 139, 141, 743 P2d 715 (1987) (an administrative search is one undertaken for a reason other than the enforcement of laws that carry criminal sanctions).

The state asserts in its supplemental briefing that Denton's conduct "was not primarily directed at gathering evidence for use in criminal prosecution." In support of that statement, the state does not rely on *evidence* regarding Denton's actual purpose, which is unsurprising in that the administrative exception was not litigated. Instead, the state argues that, legally, "the default consequence of a person fishing without a license is a non-criminal violation," citing ORS 496.992(2), and suggests that Denton asking whether defendant had a license was therefore *necessarily*

"intended to elicit a response that would have justified only the issuance of a citation for a Class D violation."

We are skeptical of the state's characterization of a noncriminal citation and fine as the "default" consequence of fishing without a license. Angling without a license is a Class A misdemeanor, subject to up to six months' imprisonment, when committed with a "culpable mental state," defined as intentional, knowing, reckless, or criminally negligent. ORS 497.075; ORS 496.992(1); ORS 496.992(17)(a); ORS 161.085(6). Angling without a license is a violation, subject to a fine but not imprisonment, when committed "without a culpable mental state." ORS 496.992(2) (a violation of the wildlife laws "that does not involve the taking of wildlife is a Class D violation if the offense is committed without a culpable mental state"); ORS 496.992(3) (a violation of the wildlife laws "that involves the taking of wildlife, other than nongame mammals and game birds, is a Class A violation if the offense is committed without a culpable mental state"); *see also* ORS 153.018 (setting maximum fines, allowing for other penalties, but not allowing for imprisonment). Whether a person commits a violation or a misdemeanor depends on the facts, and whether a person is criminally charged or noncriminally fined may turn on any number of factors. The statute itself does not provide for a "default."

In any event, the fundamental problem with the state's administrative-exception argument is that it lacks any grounding in the evidentiary record and, ultimately, is not a proper alternative basis for affirmance to raise for the first time on appeal. Had the state made the argument in the trial court,[8] the record very well could have developed differently. *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (identifying prerequisites for an appellate court to consider an alternative basis to affirm that is raised for the first time on appeal, including that the record would not have developed differently had the issue been raised in the trial court). We are

---

[8] The state alluded briefly to the administrative-search exception in the trial court, but it opted not to pursue it, stating that it did not "really need to get into" that issue.

unpersuaded that we can simply assume, without any evidence, that Denton's purpose in stopping defendant was to cite him for a noncriminal violation—notwithstanding the fact that defendant was subsequently charged and convicted of a Class A misdemeanor—let alone that Denton was acting "pursuant to a properly authorized administrative program, designed and systematically administered to control the discretion of non-supervisory officers." *Nelson*, 304 Or at 104 (internal quotation marks omitted).

We reiterate what we said in *Almahmood* when faced with a similarly undeveloped evidentiary record and a belated legal argument by the state that any seizure of the defendant was a lawful administrative stop. In *Almahmood*, we expressed "no opinion on whether, in another case, the state might be able to prove that a fare check conducted by police officers" meets the requirements of an administrative stop. 308 Or App at 807. Here, we express no opinion on whether, in another case, the state might be able to prove that a fishing license check conducted by a sheriff's deputy meets the requirements of an administrative stop. We conclude only that the state's last-minute effort to prove that in this case, with no evidentiary record to support it, is unavailing.

We also note again, as we did in in *Almahmood*, 308 Or App at 806, that "the Supreme Court has recognized that, in certain specific contexts, some types of searches or seizures may be deemed reasonable even though they do not fit neatly into the long-established exceptions to the warrant requirement." The state has not advanced an argument in this case that fishing license checks should be deemed reasonable under Article I, section 9, even if they do not fit neatly into a recognized exception. The state asks that we leave that issue open, as we did in *Almahmood*, and we do so.

In sum, defendant was seized when Denton asked him for his fishing license, and the state did not prove (or even try to prove) that the warrantless seizure was "reasonable" under Article I, section 9. The trial court therefore erred in denying defendant's motion to suppress.

Reversed and remanded.

**JAMES, J.,** concurring.

The majority notes that "[t]his case is virtually identical in principle to *Almahmood*." 318 Or App at 185. I agree that there is no principled way to affirm this conviction in light of our reasoning in *State v. Almahmood*, 308 Or App 795, 482 P3d 88 (2021), and join in the majority. I write separately only to note that, importantly for me, the parties have not taken issue with *Almahmood*, nor asked us to revisit, or disavow that decision.

I concur.

**POWERS, J.,** dissenting.

When the Oregon Supreme Court announced the test for determining whether a person's interaction with law enforcement rises to the level of a "stop" or a seizure for purposes of the state constitution in *State v. Holmes*, 311 Or 400, 408-10, 813 P2d 28 (1991), the court made two important observations. First, because of the diversity of potential encounters and the varied circumstances that might arise in each case, the test necessarily requires a fact-specific inquiry into the totality of the circumstances. *Id.* at 408. Second, the court recognized that law enforcement officers remain free to approach "persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification \*\*\*." *Id.* at 410. Although the majority opinion dutifully tracks the court's first observation and evaluates the totality of the circumstances of the deputy's two questions to defendant, I am unable to join the majority opinion because it does not adhere to the court's latter observation that the deputy was free to seek cooperation, request information, or question defendant without creating a constitutional violation. Because the Supreme Court has not disavowed that principle, I would not overrule our decision in *State v. Hammond*, 99 Or App 293, 781 P2d 1243 (1989), *rev den*, 309 Or 291 (1990). Accordingly, I respectfully dissent.

Because the test of whether a person's encounter with law enforcement rises to the level of a stop for purposes

of the state constitution focuses on the totality of the circumstances, I briefly reiterate the undisputed facts in this case. *See State v. Reyes-Herrera*, 369 Or 54, 62, 500 P3d 1 (2021) (explaining that "the critical question *** depends on the totality of the circumstances and the extent to which those circumstances would lead reasonable people to believe that their liberty or freedom of movement has been significantly restricted"). In my view, the brief two-question interaction falls short of "significantly" restricting the liberty or freedom of movement of a reasonable person.

While patrolling Emigrant Lake in a marked patrol boat (that is, a boat with sheriff's office markings and sirens), Deputy Denton saw defendant reeling in a fish. Denton, who was wearing his uniform and a personal flotation device or life jacket along with a sidearm, idled his patrol boat next to defendant's boat and started a casual conversation. Denton described the circumstances when he testified at the suppression hearing:

> "[Denton]:   Drove over next to him, he brings the fish in and unhooks it. We start a casual conversation, and how's the fishing? It's obvious he's standing in a pile of fish on the floor. It's good fishing, so my next question is do you have a fishing license.
>
> "[Prosecutor]:   And what did he say?
>
> "[Denton]:   He said no he did not.
>
> "* * * * *
>
> "[Prosecutor]:   Do you remember his exact words when he said that he didn't have a fishing license?
>
> "[Denton]:   So I wrote a quote in my—I wrote a quote in my report. And when I asked for a fishing license, he replies, 'nope.'"

Based on that two-question interaction, the majority opinion concludes that defendant was stopped for purposes of Article I, section 9, of the Oregon Constitution. That approach, in my view, is inconsistent with the Oregon Supreme Court's articulation of the standard used to assess whether an individual's encounter with law enforcement rises to the level of a seizure for purposes of the state constitution.

Over 30 years ago, the Supreme Court in *Holmes* first set out the standard courts use to measure whether a person has been seized for purposes of Article I, section 9. *See Holmes*, 311 Or at 409-10. Importantly, in announcing the constitutional standard, the court in *Holmes* emphasized that law enforcement officers may approach people in public places to seek cooperation or request information without turning the encounter into a constitutional seizure. *Id.* at 410. Because it provides important context, I quote at length the passage from *Holmes* where that language originated:

> "Under these 'seizure' standards, law enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful. A street or public place encounter does not amount to an Article I, section 9, 'seizure' merely because the encounter may involve inconvenience or annoyance for the citizen and the other party to the encounter is known to be a law enforcement officer. Even physical contact does not transform the encounter into a 'seizure' if it is a normal means of attracting a person's attention (*e.g.*, police[] tapping citizen on the shoulder at the outset to get a citizen's attention). Rather, the encounter is a 'seizure' of a person only if the officer engages in conduct significantly beyond that accepted in ordinary social intercourse. The pivotal factor is whether the officer, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens."

311 Or at 410 (citation omitted). In reaching that conclusion, the court examined its earlier holdings in *State v. Warner*, 284 Or 147, 585 P2d 681 (1978), and *State v. Painter*, 296 Or 422, 676 P2d 309 (1984), and concluded that those cases "demonstrate that law enforcement officers may approach persons on the street or in public places, question them, and even accompany them to another location without the encounter necessarily constituting a 'seizure' of a person under Article I, section 9." *Holmes*, 311 Or at 409.

Almost 20 years later, the court in *State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010), modified

part of the *Holmes* holding by abandoning the component focused on a person's subjective belief that the person had been seized and refocused the test to an objective standard. Importantly, however, the court did not modify or diminish any of the *Holmes* discussion that explained that an officer may seek cooperation or information without necessarily turning the encounter into a seizure. The *Ashbaugh* court explained that a "seizure" occurs "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances would believe that (a) above has occurred." 349 Or at 316 (emphasis omitted). It is meaningful, in my opinion, that the court remarked that a constitutional violation occurs if an officer "intentionally and significantly" restricts or interferes with an individual's liberty.

Three years after *Ashbaugh*, the court in *State v. Backstrand* reiterated the "oft-cited and oft-quoted" passage from *Holmes* about law enforcement remaining free to approach persons in public to seek cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion. 354 Or 392, 400, 313 P3d 1084 (2013) (citing *Holmes*, 311 Or at 410, and *State v. Gerrish*, 311 Or 506, 513, 815 P2d 1244 (1991) (explaining that flagging down a driver and directing the driver to stop was not a significant interference with the driver's liberty where those were the only means available to get the driver's attention long enough to request information)). The *Backstrand* court reiterated that "[t]he fact that [an individual] is discomforted by an officer's approach and request for assistance or information—either because the officer is a known police officer, or because the encounter otherwise involves 'inconvenience or annoyance'—does not make the contact a seizure." 354 Or at 400 (quoting *Holmes*, 311 Or at 410). Further, in discussing whether an officer has made a sufficient "show of authority" to create a seizure under the state constitution, the court explained that "[w]hat is required is a reasonable perception that an officer is exercising his or her official authority to restrain." *Id*. at 401.

In my view, Denton's brief interaction with defendant does not rise to the level of a seizure; rather, I would conclude that at the moment that defendant answered the question of whether he had a fishing license, defendant was engaged in a constitutionally insignificant interaction with the deputy. That is, when viewing the totality of the circumstances, Denton did not make a sufficient show of authority and he did not "significantly" restrict defendant's liberty when he engaged in the casual conversation.

To be sure, a verbal encounter may rise to the level of a seizure for purposes of the state constitution "when the content of the questions, the manner of asking them, or other actions that police take (along with the circumstances in which they take them) would convey to a reasonable person that the police are exercising their authority to coercively detain" the individual. *Id*. at 412. Indeed, the court recently reaffirmed the principle that "something more" than just asking questions or requesting information is required to establish that an officer made a show of authority requiring compliance. *Reyes-Herrera*, 369 Or at 58. Here, there was nothing in the manner in which Denton asked the questions or the other circumstances of the brief encounter on the lake that conveyed to a reasonable person that the deputy was exercising his authority to "coercively" detain defendant.

The majority opinion focuses on the potential criminal liability that defendant faced when Denton posed the second question. The problem with that approach, in my view, is that the legislature created a regulatory framework in which it is reasonable for law enforcement, fish and wildlife officials, and even landowners or their agents to ask about a fishing license when it adopted ORS 497.036.[1] Under that statute, a private landowner (or an agent for that landowner)

_____

[1] ORS 497.036 provides:

"The holder of any license, tag or permit to angle, take, hunt or trap must consent to the inspection of any such license, tag or permit and any wildlife taken pursuant to such license, tag or permit:

"(1) By any employee of the State Fish and Wildlife Commission or any person authorized to enforce the wildlife laws.

"(2) By the owner, or the agent of the owner, of any land upon which the license, tag or permit holder is angling for, taking, hunting or trapping any wildlife."

may approach a person angling on the property and ask to inspect—which arguably is a step beyond merely asking about the existence of—the fishing license. That same statute allows law enforcement, among other officials, to make the same request. Thus, given the scope of ORS 497.036, it is difficult for me to conclude that Denton's second question rises to the level where he "intentionally and significantly" restricted defendant's individual liberty by asking him if he had a fishing license.[2]

The approach by the majority opinion twists the framework regulating the taking of fish and wildlife by using what the legislature designed as a permissible question to transform an encounter into one needing a heightened level of suspicion to justify it if it proved fruitful. "Wildlife is the property of the state," ORS 498.002(1), and the approach by the majority opinion effectively will require law enforcement to always articulate a heightened level of suspicion before asking an individual if there is a proper license, tag, or permit. In my view, where the legislature has provided that both private landowners and law enforcement officials alike may ask to inspect a fishing license, we should conclude that that limited encounter does not necessarily rise to the level of a seizure under the constitution. *See Holmes*, 311 Or at 410 (explaining that the pivotal factor is whether officers—even if making inquiries private individuals would not—have otherwise acted in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary individuals).

Further, to the extent that our decision in *State v. Almahmood*, 308 Or App 795, 482 P3d 88 (2021), runs

---

Notably, the statute requires the holder of such a license, tag, or permit to consent to the inspection of any such document, which could be viewed as even more intrusive—when assessing the totality of the circumstances—than merely asking about the existence of such a license, tag, or permit as Denton's question raised.

[2] The interaction may well have developed into a seizure where Denton could have made a sufficient "show of authority" to effectuate a seizure, but that is not what the majority opinion decides. Rather, the majority opinion—and hence my disagreement—centers on the conclusion that Denton effectuated a seizure as a result of the two-question interaction, *viz.*, that defendant's answer to whether he had a license and his subsequent explanation for why his fishing license was suspended should be suppressed as the product of an unconstitutional seizure.

contrary to the principle articulated in *Holmes,* and reiterated in *Ashbaugh*, *Backstrand*, and other cases about officers being able to seek cooperation or assistance, request or impart information, and question individuals without being called upon to articulate a heightened level of suspicion in justification of the encounter, we are bound to follow Supreme Court precedent. More problematic, however, the majority opinion appears to read *Almahmood* broadly as if, in any regulatory structure where the legislature creates a statutory obligation for an individual with potential criminal penalties for noncompliance, law enforcement would not be able to ask individuals to demonstrate compliance with the applicable regulations without effectuating a seizure. For instance, according to the reasoning of the majority opinion, if an officer catches a glimpse of an otherwise concealed handgun tucked in a waistband, that officer would not be able to ask that individual if the person had a concealed handgun license under ORS 166.292 without articulating some heightened justification. Instead of automatically turning that type of encounter into a seizure, we should evaluate the totality of the circumstances to determine whether the officer made a sufficient show of authority. We should not limit the legislature's ability to construct a regulatory framework where law enforcement checks compliance with that framework, even if there are possible criminal penalties, without that encounter necessarily turning into a seizure under the constitution. *See State v. Fair*, 353 Or 588, 599 n 5, 302 P3d 417 (2013) (observing that "some actions that officers take in halting and engaging citizens in public settings and in common with other passing citizens are not, in a constitutional sense, 'coercive' and are not sufficiently intrusive to constitute seizures for constitutional purposes").

In short, the circumstances presented in this case are not "sufficiently intrusive" or "coercive" to constitute a seizure merely by posing the questions that the deputy did. Rather, under the totality of the circumstances, the deputy's brief interaction with defendant, culminating in a question that the legislature specifically provides for in its framework regulating the taking of wildlife—and one in which private individuals and law enforcement alike may ask—did not transform the encounter into one that has the hallmarks of

a "show of authority" or into one where the deputy has "significantly" interfered with defendant's liberty.

Finally, I recognize, of course, that the work of refining what constitutes a seizure for purposes of the state constitution is an ongoing process and that the Supreme Court may want to refine—or even completely disavow—the notion that law enforcement officers may seek cooperation or request information without articulating a certain level of suspicion to justify the conversation. But it has yet to do that. And that sort of constitutional shift, if any, must be made using the established criteria for altering settled precedent. *See Backstrand*, 354 Or at 400 n 9 (stating same and citing *Farmers Ins. Co. v. Mowry*, 350 Or 686, 693-94, 261 P3d 1 (2011) (discussing the application of *stare decisis* in cases involving constitutional provisions)). Significantly, the court in *Backstrand* observed that "such a change must be animated by and tailored to policies embodied in the terms of Article I, section 9, and not [the court's] own normative values of how police and [individuals] do or should interact." *Id*. Ultimately, because the Supreme Court has not disavowed or refined what it said 30 years ago about seeking cooperation or requesting information, I would not overrule *Hammond*, which concluded that an officer did not "stop" the defendant on a boat ramp when he asked to see the defendant's fishing license and potentially retained it.

Accordingly, I respectfully dissent.

Mooney, Kamins, and Pagán, JJ., join in this dissent.